1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  DEBORAH R. DOUGLAS (NYBN 2099372)
   Assistant United States Attorney
5
      1301 Clay Street, Suite 340S
6     Oakland, CA 94612
      Telephone: (510) 637-3680
7     Facsimile: (510) 637-3724
      E-Mail Address: deborah.r.douglas@usdoj.gov
8
   Attorneys for Plaintiff
9
                        UNITED STATES DISTRICT COURT
10
                      NORTHERN DISTRICT OF CALIFORNIA
11
                            OAKLAND DIVISION
12

13 UNITED STATES OF AMERICA,          )  Nos.: CR07-0794 DLJ; CR07-0797 DLJ
                                       )
14               Plaintiff,            )
                                       )  UNITED STATES' APPEAL OF
15          v.                         )  MAGISTRATE'S PRE-TRIAL RELEASE
                                       )  ORDER
16 JOSE DE JESUS GUZMAN-BAEZ           )
   (a/k/a Jose De Jesus Guzman, a/k/a Jose )  Next Court Proceeding: January 25, 2008 at
17 Guzman, a/k/a Pepe),                )  9 a.m.
                                       )
18               Defendant.            )
                                       )
19 _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................... 2

II.   STANDARD OF REVIEW .................................................. 3

III.  BACKGROUND .......................................................... 3

IV.   DETENTION HEARING ................................................... 5

    A.  Commencement of Detention Hearing on December 26, 2007 .................. 5

    B.  Conclusion of Detention Hearing on January 2, 2008 ....................... 7

        1.  Pretrial Services' Recommendation ..................................... 7

        2.  The Magistrate Judge's Opening Comments ............................. 8

        3.  Defendant's Arguments ............................................... 9

        4.  The Government's Arguments .......................................... 9

        5.  The Magistrate Judge's Ruling ........................................ 13

V.  DEFENDANT IS A SERIOUS FLIGHT RISK
    AND SHOULD REMAIN IN DETENTION ................................... 14

CONCLUSION ............................................................... 21

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

Parrilla v. Gonzales, 414 F.3d 1038, 1041 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4

United States v. Koenig, 912 F.2d 1190 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5

6

### FEDERAL STATUTES

7

8 U.S.C. § 1101(a)(43)(P) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8

8 U.S.C. § 1229b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9

8 U.S.C. § 1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4

10

18 U.S.C. § 1546(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11

18 U.S.C. § 3142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12

18 U.S.C. § 3142(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

13

18 U.S.C. § 3145(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14

42 U.S.C. § 408(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

Defendant, an illegal alien, has been detained since his arrest on November 6, 2007 by Immigration and Customs Enforcement ("ICE"), which lodged a detainer. Over the Government's objection, Magistrate Judge Nandor J. Vadas ordered defendant's release on a $50,000 bond to be secured by $25,000 in equity through the property of Carlos Fuentes, who was described as defendant's friend. Defendant's common-law wife, Maria Ramirez, an illegal alien in deportation proceedings, was named as defendant's custodian and also a surety on the $50,000 bond. Pending the government's appeal to the district court judge, the magistrate judge stayed the release order to January 25, 2008, the next court proceeding before the district court judge.

The preponderance of the evidence establishes that defendant is a serious flight risk and there are no combinations of conditions that would reasonably assure his appearance at future court proceedings. The factors that establish defendant's flight risk include, but are not limited to:

- the nature of the criminal charges involving the harboring and employment of illegal aliens, possession of a fraudulent immigration document, and fraudulent use of a social security;
- defendant's recent presence in Mexico two weeks before his arrest and his easy ability to move back and forth from the United States to Mexico without inspection by immigration officials;
- defendant's common-law wife Maria Ramirez and their 13-year old son are illegal aliens;
- all of defendant's employees at Pepe's Cabinets on November 6, 2007 were illegal aliens;
- defendant has maintained ties to Mexico and carries a Mexican consular identification card and Mexican driver's license;
- defendant possessed a fraudulent permanent resident card, a fraudulent California driver's license, and a valid California driver's license, the latter of which he obtained by submitting a false birth certificate to the Department of Motor Vehicles;
- defendant facilitated and encouraged his employees to procure fraudulent immigration and identification documents;
- defendant has repeatedly submitted fraudulent social security numbers as well as declarations under penalty of perjury to government agencies;

2

- defendant has repeatedly permeated fraud against a number of federal, state, and local government agencies;
- defendant has made false statements to federal law enforcement agents;
- defendant has made false statements to Pretrial Services and has declined to respond to Pretrial Services' questions about his immigration status and the identities and locations of his siblings; and
- defendant has three failures to appear based upon various traffic violations in 1999, 2002, and 2004.

## II. STANDARD OF REVIEW

Under 18 U.S.C. § 3145(a)(1), the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of a release order.

The district court's standard of review of a magistrate's order is *de novo*, and not a deferential standard. United States v. Koenig, 912 F.2d 1190 (9th Cir. 1990). A district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." Id. at 1193. Further, "[i]f the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate." Id. A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence.

## III. BACKGROUND

On October 29, 2007, a Criminal Complaint charged defendant with Harboring Illegal Aliens (8 U.S.C. § 1324[a][1][A][iii]), Employment of Illegal Aliens (8 U.S.C. § 1324a[a][1][A]), and Continuing Employment of Illegal Aliens (8 U.S.C. § 1324a[a][2]).

On November 6, 2007, a search warrant was executed at Pepe's Cabinets, a carpentry business owned by defendant in Oakland since its inception in November 1998. On that same date, defendant was arrested and made inculpatory admissions to ICE agents. Eight of defendant's employees were also arrested and all made inculpatory statements against the defendant. Defendant and all of his employees are illegal aliens. On November 6, 2007, Immigration and Customs

3

Enforcement ("ICE") lodged a detainer against the defendant based upon his illegal presence in the United States.

On November 7, 2007, defendant was initially presented before the Honorable Wayne D. Brazil, United States Magistrate Judge, on the criminal complaint. Based upon the ICE detainer, defendant's illegal presence in the United States, and the lack of information about defendant, Pre-Trial Services determined that defendant posed a risk of flight in a written report. A detention hearing was scheduled for November 13, 2007.

On November 13, 2007, and again on November 20, 2007, defendant waived his right to a detention hearing without prejudice.

On December 13, 2007, a federal grand jury returned a felony indictment charging defendant with eight counts of Harboring an Illegal Alien (8 U.S.C. § 1324[a][1][A][iii]), one count of Possession of Counterfeit Immigration Document (18 U.S.C. § 1546[a]), and two counts of Fraudulent Use of Social Security Number (42 U.S.C. § 408(a)(7)(B), under docket no. CR07-0794 DLJ.

On December 14, 2007, a misdemeanor Information charged defendant with eight counts of Employment of Illegal Aliens (8 U.S.C. § 1324a[a][1][A]), and eight counts of Continuing Employment of Illegal Aliens (8 U.S.C. § 1324a[a][2]), under docket no. CR07-0797 WDB.

On December 18, 2007, defendant was arraigned on the indictment and information. Defendant requested that a detention hearing be held on December 26, 2007.

By order dated December 21, 2007, the Honorable D. Lowell Jensen, United States District Judge, determined that both cases are related pursuant to Local Rule 8-1.

In Magistrate Judge Brazil's absence, a detention hearing was commenced before Magistrate Judge Nandor J. Vadas in San Francisco on December 26, 2007, and concluded on January 2, 2008. Over the Government's objection, defendant was ordered released on a $50,000 bond to be secured by $25,000 in equity through the posting of Carlos Fuentes' property. Defendant's common-law wife, Maria Ramirez, an illegal alien in deportation proceedings, was named as defendant's custodian and also a surety on the $50,000 bond.

4

## IV. DETENTION HEARING

A. Commencement of Detention Hearing on December 26, 2007

On December 26, 2007, through his attorney, defendant argued that he should be released given that "[h]e has been in the United States for 13 years, albeit illegally in this country" (A5).[1] According to defendant, during that period, he has resided and worked in Oakland (A5). Defendant stated that he has filed numerous documents with the City of Oakland regarding his business "Pepe's Cabinet" since its inception in 1998 (A5). Defendant stated that the current federal prosecution does not involve guns, drugs, or alien smuggling, but, rather, "[n]othing more than employing illegal aliens" (A6). Defendant argued that the Department of Homeland Security was aware of his presence in the United States since July 2006, but that he was not arrested until 2007 after an "ongoing investigation" (A6).

Defendant stated that his common-law wife Maria Ramirez is also an illegal alien and seven months pregnant, and that she was arrested by ICE and released on her own recognizance pending an immigration court appearance on March 6, 2008 (A6-7). According to defendant, the "availability of being bonded out or released on his own recognizance exists for him as well given the facts of this case as it does for his wife" (A7).

The magistrate judge responded that the "problem" involves a "chicken and egg issue" (A7). "Getting him into immigration releases the district court's hold on your client. We can't get him back if they choose to deport him right away. On the other hand, he can't be in front of an immigration judge for bond unless he's out of custody from us. So it becomes a complicated dynamic that's difficult to solve" (A8).

The magistrate judge asked for the government's position and the government attempted to present its proffer (A8). Shortly after the government commenced its proffer, the magistrate judge interjected with a comment that is was "pretty clear" that defendant was hiring illegal aliens at his cabinet shop and that the charges were "all misdemeanors" (A10). The government advised the

---

[1] Unless otherwise indicated, numbers in parentheses preceded by the letters "A" and "B" refer to the transcripts of the detention hearings on December 26, 2007 and January 2, 2008, respectively.

1    magistrate judge that every count in the indictment is a felony (A10).  The magistrate judge stated

2    that he had not read the eleven-count felony indictment, which was then handed to the court (A10).

3            The government attempted to proceed again with its proffer and began discussing defendant's

4    fraudulent activities "which goes directly to a risk of flight" (A10-11).   The magistrate judge

5    interjected again and opined that fraud goes "to the weight of the evidence, not his flight risk. You

6    haven't said anything about his flight risk, whether or not you have any evidence that he would go

7    back to Mexico" (A11).   Only a few seconds earlier, the government had advised the magistrate

8    judge, inter alia, that, upon defendant's arrest on November 6, 2007, defendant made admissions to

9    the government, including that he had re-entered the United States from Mexico only 15 days before

10   his arrest (A9).  Defendant was in Mexico for a few weeks (A9).  As the government stated, "it's

11   very easy to cross from the United States to Mexico through a land border without being detected"

12   (A9).  When defendant was arrested on November 6, 2007, he was in possession of a Mexican

13   driver's license and Mexican identification card (A9).

14           The magistrate judge did not want the government to proceed with its proffer "without the

15   valuable asset of a Pretrial Services report" (A11).  The magistrate judge wanted Pretrial Services

16   to interview the defendant and to assess defendant's current status, his criminal history, where

17   defendant is residing, what defendant intends to do, if he is going to post security, who the sureties

18   are and what their positions are in writing (A11-12).  The previously issued Pretrial Services report

19   contained a criminal records check and a recommendation for detention based upon defendant's

20   illegal presence in the United States, the ICE detainer, and the lack of information about the

21   defendant.  The government requested permission to proceed with the proffer because there was

22   "valuable information that the government has that is not before the Court" (A12).  The magistrate

23   judge responded that a proffer by the government was "a little bit premature without a Pretrial

24   Services report" (A12).

25           Notwithstanding, the magistrate judge sought a proffer from an immigration attorney, who

26   was also in the courtroom on behalf of the defendant, regarding his opinion as to the "chances of at

27   least bonding your client out at the time of his initial appearance before the immigration judge?"

28   (A14).  The immigration attorney responded that an immigration judge "essentially does the same

6

balancing act" to determine risk of flight and danger (A14). The magistrate judge stated that defendant and all his employees are illegal aliens . . . And I think that pretty much focuses on what the indictment focuses. I'm sorry, I only looked at the information, but I assume the indictment is pretty much – pretty much the same" (A14). The immigration attorney stated that, if the magistrate judge released defendant on a bond, the immigration court "certainly would take into consideration" that defendant was released on a bond in federal court and the amount of the bond (A15). The immigration attorney represented that at least three individuals in the courtroom are homeowners who have indicated a willingness to post their property (A15). The immigration attorney further represented that all the other individuals who were present in the courtroom have indicated a willingness to be sureties (A15).

The government stated that "there's a lot about the defendant the Court does not know, including his failures to appear" (A15).

B. Conclusion of Detention Hearing on January 2, 2008

1. Pretrial Services' Recommendation

In its second report, Pretrial Services again recommended to the magistrate judge that defendant be detained as a flight risk. Based upon its thorough investigation, Pretrial Services did not believe that there are any combination of release conditions which could reasonably assure the defendant's appearance at future court proceedings.

Pretrial Services expressed various concerns about the defendant (Pretrial Services Report, p. 5). Specifically, Pretrial Services noted defendant's status as an illegal alien, his admission that he recently traveled to Mexico for two weeks and was able to return to the United States. Pretrial Services found this to be particularly concerning since the nature of the defendant's charges involved his ability to obtain false identifiers and identification documents for not only himself, but for others. Pretrial Services further noted that defendant still maintains ties to Mexico. Pretrial Services was also troubled by the fact that defendant's significant other and his older child are not in the United States legally.

7

1   In addition, of the four potential sureties interviewed by Pretrial Services, only two seemed

2   to be financially viable, and only one of those individuals may be in a position to post property

3   (Pretrial Services Report, pp. 5-6).[2]

4       2. The Magistrate Judge's Opening Comments

5       The magistrate judge rendered his preliminary determination to release the defendant without

6   first providing the government with the opportunity to complete its proffer (B3-4). The magistrate

7   judge started the hearing by announcing that defendant would most likely be released on a bond, but

8   for the immigration detainer (B4). The magistrate judge stated that the bond would probably be

9   $50,000 with $25,000 of that amount secured by Carlos Fuentes' property (B4).

10      The magistrate judge then stated "But here's the issue. And this is one – you know, we go

11  back and forth in these cases all the time. It's the same issue. It's if I release him out of custody

12  here, then I have a problem of him going before the immigration court downtown. And if they

13  remand him into custody, there's nothing to hold him, he's gone, and then the government is unable

14  to go forward with their case. And so the court is always leery of doing it. Perhaps, Counsel, maybe

15  it would be best to hear from his immigration lawyer? *I'll leave it up to you*" (emphasis added) (B4-

16  5).

17

18

19

20

21      [2] The Pretrial Services report incorrectly states that information that defendant owned
property in Oakland was obtained from government's counsel (Pretrial Services report, p. 6). As

22  set forth in its report, Pretrial Services obtained that information based upon its interview with
ICE Special Agent Michael Barge (Pretrial Services report, p. 5). The only information

23  provided by government's counsel to Pretrial Services is contained in my letter dated December
27, 2007 (B34-35; Exhibit E). In the courtroom, government's counsel stated that "[t]he case

24  agent informed me that he seized documents from Pepe's Cabinets indicating that this defendant

25  owns that property" (B23). After the court proceeding, at my request, the case agent forwarded a
copy of the pertinent documents. Upon my review, the documents include a Residential

26  Purchase Agreement and related realty papers pertaining to the property located at 2164 48th
Avenue, Oakland, and are signed and/or initialed by defendant, as the buyer of the property, on

27  January 31, 2006. It is unknown whether the purchase of the property was completed. A

28  computer check by the case agent indicates that defendant is not the current owner of that
property.

8

3. Defendant's Arguments

Defendant's immigration attorney responded that defendant's common-law wife Maria Ramirez "stands in a very much similar position to Mr. Guzman from an immigration vantage point. They have been here in the United States for approximately 13 years" (B5). The immigration attorney stated that ICE took Ms. Ramirez into custody and placed her in deportation proceedings by service of a charging document and notice to appear (B5). The immigration attorney admitted that he did not know the basis for ICE's decision to release Ms. Ramirez on her own recognizance, whether it was because Ms. Ramirez was seven months pregnant or whether it was because ICE knew where to find her (B6). The immigration attorney stated that he filed applications for cancellation of removal and a work permit on behalf of Ms. Ramirez (B6).     The immigration attorney stated that, once defendant has been released from federal court on a bond, he will appear before an immigration judge (B6-7).

The magistrate judge stated "Now here's – here's the court's problem. And I believe it's correct. There's no way to fashion a bond that would allow me to, quote, "let him go and hold onto him at the same time." I hate saying that. But what troubles the court is that Judge Yamaguchi or Judge Murry [immigration judges], who have discretion in their courtroom to determine what they wish to do with defendants that are before them, if I release him outright then I have no say over that and neither does Ms. Douglas. That's the – that's the problem" (B8-9).

Defendant's immigration attorney and defense attorney stated that, if an immigration judge decides to detain the defendant, they would arrange to have defendant returned to federal criminal detention so that he could receive jail-time credit (B9, 11).

4. The Government's Arguments

The magistrate judge gave the government the opportunity to object to defendant's release (B11).     The government stated that it wanted to make a record and reminded the magistrate judge that the government had only started its proffer and was told to wait until the Pretrial Services report was completed (B12). The magistrate judge responded that he had read the Pretrial Services report in detail (B12). The government replied that it wanted to make a full presentation for the record (12).

9

1    The government argued that, based upon the factors set forth in 18 U.S.C. § 3142, the
2    preponderance of the evidence establishes that defendant is a flight risk (B20-21). The government
3    pointed out, inter alia, as follows:

4    Defendant admitted post-Miranda that he is an illegal alien from Mexico with no valid
5    documents (B14). As defendant demonstrated, he has the ability to easily move in and out of the
6    United States (B14). Only 15 days prior to defendant's arrest on November 6, 2007, defendant
7    illegally crossed the Mexican border into the United States at or near Sonora, Arizona, without being
8    inspected by an immigration officer (B14). It is very easy to cross through the land border without
9    being detected (B14). When defendant was arrested on November 6, 2007, he possessed a Mexican
10   driver's license and a Mexican consular identification card (B14).

11   Defendant's life is surrounded by illegality and fraud – and he has been functioning like this
12   for a very long time (B20). Fraud permeates defendant's activities involving a number of federal,
13   state, and local government agencies, i.e., the Department of Homeland Security, Social Security
14   Administration, Internal Revenue Service, California Employment Developmental Department
15   ("EDD"), and the City of Oakland Business Tax Office (B13). Fraud and concealment go directly
16   to the issue of risk of flight (B13). In addition, defendant has three failures to appear based upon
17   various traffic violations in 1999, 2002, and 2004 (B13).

18   Defendant has the means and ability to obtain false identification documents, false birth
19   certificate, and false immigration documents (B13). Defendant has committed perjury under oath
20   in declarations submitted to the City of Oakland Business Tax Office (B13-14).    He has also
21   submitted false social security numbers (B14).

22   On November 6, 2007, all nine of defendant's employees, including his wife Maria Ramirez,
23   were illegal aliens (B14). On that date, ICE interviewed eight employees, all of whom admitted that
24   they are illegal aliens (B14-15). All eight employees provided incriminating evidence against the
25   defendant (B15). For example, Michel Velasco-Pantoja ("Velasco") stated that when he showed the
26   defendant his Mexican identification, defendant instructed him to go to International Avenue in
27   Oakland and pay for a forged social security card and permanent resident card (B15). After Velasco
28   showed defendant the fraudulent documents that he had purchased, defendant permitted him to work

10

1    at Pepe's Cabinets (B15). As another example, defendant's secretary, Maria Guadalupe Gamino-

2    Perez ("Gamino"), stated that she had filled out a job application to work at Pepe's Cabinets and

3    provided defendant with her Mexican matricula and a fake social security card that her friend had

4    obtained for her (B15). Defendant took a copy of the social security card and asked Gamino if the

5    social security card was good, and she told him "no" (B15).

6         The search of Pepe's Cabinets disclosed numerous documents implicating the defendant,

7    including five identification cards belonging to the defendant, i.e., two Mexican identification cards,

8    a fraudulent California Driver's license, a fraudulent permanent resident card, and a valid California

9    Driver's License (B15-16). Records from the California Department of Motor Vehicles indicate that

10   defendant obtained the valid California Driver's license by submitting a U.S. birth certificate (B16;

11   Exhibit D). The birth certificate was fraudulent, as defendant was born in Mexico, not the United

12   States (B16).

13        Also recovered during the search of defendant's business were copies of at least seven

14   additional fraudulent permanent resident cards (B16).     Two of the cards belonged to current

15   employees and five belonged to past employees (B16). Copies of at least seven fraudulent social

16   security cards were also seized (B16). Two of the cards belonged to current employees, and five

17   belonged to past employees (B16).

18        Additional evidence was recovered from Pepe's Cabinets, including a few completed job

19   applications where the employee answered "yes" to the question" "Are you prevented from lawfully

20   becoming employed in this country because of your visa or immigration status?" (B16).

21        Defendant was required to submit a quarterly report to EDD identifying the names and social

22   security numbers of all of his employees (B17). Although Pepe's Cabinets has been conducting

23   business since November 1998, the first quarterly report was not submitted to EDD until 2001 (B17).

24   ICE obtained copies of the EDD reports submitted by Pepe's Cabinets from 2001 through the second

25   quarter of 2007 (B17). ICE's review of the EDD reports indicate that defendant failed to report

26   certain employees to EDD (B17). In addition, all social security numbers submitted for the seven

27   employees reported in the year 2006, and for the four additional employees reported in the last two

28

11

1  quarters, are fraudulent (B17).  Of the social security numbers submitted by defendant for
2  approximately 40 employees since 2001, only five are valid (B17).

3  Defendant also submitted false declarations to the City of Oakland Business Tax Office
4  "under penalty of perjury" (B17).  In those declarations, defendant falsely represented that he had
5  no more than one employee when, in fact, he had employed approximately 40 employees since 2001
6  (B17-18).  In the same declarations, defendant falsely represented that Social Security Number 672-
7  90-9824 was assigned to him (B18).

8  Defendant was required by law to complete Employment Eligibility Forms (I-9s) for all of
9  his employees to establish that every employee is authorized for employment in the United States
10 (B18).  By his own admission, defendant did not complete any I-9 forms (B18).

11 Defendant also perpetrated fraud against the Internal Revenue Service by paying a number
12 of his employees in cash and by failing to provide his employees with W-2 forms (B18).  Although
13 defendant claimed that he provided three of his current employees with W-2 forms, two of the three
14 employees stated that they never received a W-2 form (B18-19).  The third employee is not only the
15 manager of Pepe's Cabinets, he resided with the defendant (B19).

16 With respect to certain matters contained in the Pretrial Services report, the government
17 pointed out that defendant has moved from place to place and did not even know some of his former
18 addresses (B20).  Moreover, defendant told the Pretrial Services officer that he had been working
19 at Pepe's Cabinets for 12 years when that business has only been in existence for nine years, since
20 1998 (B19).  Pepe's Cabinets is now out of business (B20).

21 The government admitted into evidence copies of five identification documents seized from
22 defendant on the date of his arrest; a report from the Department of Motor Vehicles indicating that
23 defendant had three failures to appear in traffic court and used a fraudulent U.S. birth certificate to
24 obtain a California driver's license; and the government's letter dated December 27, 2007 to Pretrial
25 Services (B21, 34-35).  These documents have been attached as Exhibits C, D, and E, respectively.

26 In the presence of the magistrate judge, defendant's immigration attorney provided the
27 government with a copy of the Notice to Appear dated December 18, 2007 and Notice of Hearing
28 in Removal Proceedings dated December 21, 2007 served upon defendant's common-law wife Maria

12

1   Ramirez by ICE (A7, B6).    The immigration attorney also provided the government with an

2   application for cancellation of removal dated December 21, 2007 which he had filed on behalf of Ms.

3   Ramirez (A7, B6).    These documents are attached as Exhibits F, G, and H, respectively.

4         5. The Magistrate Judge's Ruling

5         The magistrate judge opined that the immigration attorney has been successful "in obtaining

6   at least some stay of the immigration proceedings" against Maria Ramirez (B23).    The magistrate

7   judge stated that the immigration attorney "feels that given all the circumstances that there's most

8   likely some likelihood that Mr. Guzman-Baez will also be allowed to remain until such time as both

9   (unintelligible)" (B23).    According to the magistrate judge, if the immigration court decided to

10  detain the defendant, the government could place a detainer on him (B24).    The magistrate judge

11  concluded that, given all of these facts, and that Maria Ramirez will act as defendant's custodian and

12  surety for a $50,000 bond and that defendant's friend Carlos Fuentes will also act as a surety and

13  post $25,000 in property towards the $50,000 bond, "this court does find that there's sufficient facts

14  brought before it to assure the presence of this defendant for any further proceeding" (B24, 32).

15        Upon the magistrate judge's inquiry, Maria Ramirez stated that her family resided at 3933

16  Milbe, Oakland, California, and then stated that they used to live at that location (B26).    Ms.

17  Ramirez stated that they currently reside with friends at 2272 86th Avenue, Oakland, California

18  (B27).    The magistrate judge requested the telephone number for these friends, but made no inquiry

19  as to their identities or whether they have legal status in the United States (B27-28). The government

20  pointed out that, based upon Ms. Ramirez's application [for cancellation of removal], her family only

21  moved into 2272 86th Avenue on December 13, 2007, two weeks before the conclusion of the

22  detention hearing on January 2, 2008 (B27; Exhibit H).

23        The magistrate judge ordered that defendant remain in the custody of Maria Ramirez at 2272

24  86th Avenue on electronic monitoring (B30, 32).    When the Pretrial Services officer informed the

25  magistrate judge that its agency had reached its quota and could not accept any more electronic

26  monitoring cases, the magistrate judge responded that defendant would not be released "regardless

27  of his immigration status" until the electronic monitoring was in place (B31-32).    The magistrate

28  judge instructed Ms. Ramirez "that means that you have to make sure that Mr. Guzman-Baez follows

13

1  all the terms and conditions of his bond. If he fails to abide by them, you have an obligation to call
2  Pretrial Services" (B30).

3      The government objected to the magistrate judge's ruling that defendant's common-law wife
4  Maria Ramirez, an illegal alien, would serve as the custodian and surety for defendant, who is also
5  an illegal alien (B34).

6      The government stated that it would appeal the magistrate judge's release order to the district
7  court judge and requested a stay (B24). The magistrate judge stayed the release order until January
8  25, 2008, defendant's next court appearance before the district court judge (B35). A copy of the
9  order setting conditions of release is attached as Exhibit I.

10                              **V.  DEFENDANT IS A SERIOUS FLIGHT RISK**
                                **AND SHOULD REMAIN IN DETENTION**
11

12      For the reasons set forth by the government in magistrate court, as well as the grounds
13  articulated by Pretrial Services in its report, the preponderance of the evidence establishes that
14  defendant is a flight risk and there are no combination of conditions that would reasonably assure
15  his appearance at future court proceedings pursuant to 18 U.S.C. § 3142(g). The factors to be
16  considered under § 3142(g), i.e., the nature and circumstances of the offenses charged, the weight
17  of the evidence, and the history and characteristics of the defendant, all support pre-trial detention.
18  Defendant, an illegal alien, has been in detention since his arrest on November 6, 2007.

19      Defendant has been charged with 27 criminal counts. In a felony indictment, defendant has
20  been charged with eight counts of harboring illegal aliens, including his common-law wife Maria
21  Ramirez, one count of possession of counterfeit immigration documents, and two counts of
22  fraudulent use of social security numbers. In a misdemeanor information, defendant has been
23  charged with eight counts of employing illegal aliens and eight counts of continuing to employ
24  illegal aliens, including Maria Ramirez, at Pepe's Cabinets, a carpentry business owned by defendant
25  since its inception in 1998.

26      On November 6, 2007, all nine employees working at Pepe's Cabinets were illegal aliens
27  (B14). Not only did defendant employ and harbor illegal aliens as part of his modus operandi, he
28  created and sanctioned a work environment of fraud and deceit in violation of federal, state, and local

14

laws. All of defendant's employees interviewed on November 6, 2007 provided incriminating evidence against the defendant. A number of defendant's employees told ICE agents that, in the environment of Pepe's Cabinets, the workers openly discussed their illegal immigration status and how they illegally entered the United States (Criminal Complaint Affidavit, ¶ 13b).[3] For example, Maria Ramirez told co-workers how easy it was for her to illegally cross the border from Mexico into the United States through Mexicali, a town situated close to the border (Criminal Complaint Affidavit, ¶ 13b). Ms. Ramirez stated that she jumped a fence and then crossed a sewer (Criminal Complaint Affidavit, ¶ 13b). In his post-Miranda interview, defendant admitted, inter alia, that he was well aware that a number of his employees were illegal aliens (ICE Report dated 1/13/07, p. 3). Defendant's and Ramirez's 13-year old son is also an illegal alien (Pretrial Services Report, p. 4).

The Magistrate Judge was informed of the common knowledge of how easy it is for an illegal alien to cross the border between the United States and Mexico without being detected (B14). As Pretrial Services noted, defendant still maintains ties to Mexico (Pretrial Services Report, p. 5). Defendant admitted to Pretrial Services, as he had to ICE agents, that he had crossed the border from the United States to Mexico as recently as September 2007 and then reentered the United States without inspection from immigration officials only two weeks before his arrest on November 6, 2007 (B14; Pretrial Services Report, p. 5). Upon his arrest, defendant was in possession of a Mexican driver's license and a Mexican consular identification card (B14). It is significant that defendant was not forthcoming in his interview with Pretrial Services. Defendant declined to discuss his immigration status on advice of counsel (Pretrial Services Report, p. 3) . Defendant stated that he has three siblings who reside in Mexico and three siblings who reside in the United States, but would not elaborate about their identities or locations on the advice of counsel (Pretrial Services Report, p. 2).

As Pretrial Services recognized, defendant's ability to easily move back and forth from Mexico is "particularly concerning" given the nature of the pending criminal charges involving "his

---

[3] This evidence is also documented in numerous ICE reports, which the government will make available to the district court upon request.

1    ability to obtain false identifiers and identification documents for not only himself, but for others"

2    (Pretrial Services Report, p. 5). Defendant had the means and ability to obtain false identification

3    documents, false birth certificate, and false immigration documents (B13). Upon execution of a

4    search warrant at Pepe's Cabinet's on November 6, 2007, numerous documents implicating the

5    defendant were recovered, including a fraudulent California driver's license and a fraudulent

6    permanent resident card, both in defendant's name (B15-16). Also seized was a valid California

7    driver's license issued to defendant after his submission of a fraudulent United States birth certificate

8    to the Department of Motor Vehicles (B15-16). The search of Pepe's Cabinets also disclosed copies

9    of at least seven additional fraudulent permanent resident cards and seven fraudulent social security

10   cards in the names of current and past employees (B16).

11          Defendant facilitated and encouraged his illegal alien workforce to also engage in criminal

12   conduct. For example, Michel Velasco-Pantoja ("Velasco") told ICE agents that when he showed

13   the defendant his Mexican identification, defendant instructed him to go to International Avenue in

14   Oakland and pay for a forged social security card and permanent resident card (B15). After Velasco

15   showed defendant the fraudulent documents that he had purchased, defendant permitted him to work

16   at Pepe's Cabinets (B15). As another example, defendant's secretary, Maria Guadalupe Gamino-

17   Perez ("Gamino"), stated that she filled out a job application to work at Pepe's Cabinets and

18   provided defendant with her Mexican matricula and a fake social security card that her friend had

19   obtained for her (B15). Defendant took a copy of the social security card and asked Gamino if the

20   social security card was good, and she told him "no" (B15).

21          As the Magistrate Judge was informed, defendant's life is surrounded by illegality and fraud

22   -- and he has been functioning like this for a very long time (B20-21). Fraud and concealment go

23   directly to the issue of risk of flight (B13). Fraud permeated defendant's activities involving a

24   number of federal, state, and local government agencies, i.e., the Department of Homeland Security,

25   Social Security Administration, Internal Revenue Service, California Employment Developmental

26   Department ("EDD"), and the City of Oakland Business Tax Office (B13). Since 2001, defendant

27   has failed to report certain employees to EDD (B17). Defendant has submitted false social security

28   numbers in connection with numerous illegal alien employees to EDD (B17). In addition, defendant

16

1  repeatedly committed perjury under oath in declarations submitted to the City of Oakland Business
2  Tax Office (B17). In his declarations, defendant falsely represented that a social security number
3  was assigned to him and also falsely represented that he had no more than one employee at Pepe's
4  Cabinets (B17-18).

5       In committing fraud against the Internal Revenue Service, defendant paid a number of his
6  employees in cash and did not provide them with W-2 forms (B18). Defendant made false
7  statements to federal agents when he claimed to have provided W-2 forms to three employees (B18-
8  19). Two of the three employees explicitly told federal agents that they had never received a W-2
9  form based upon their employment at Pepe's Cabinets (B18-19). The third employee, the manager
10 of Pepe's Cabinets who also lived with defendant and Maria Ramirez, claimed to have received a
11 W-2 form (B18-19). However, there is nothing to support that claim. In addition to making false
12 statements to federal agents, defendant also falsely represented to Pretrial Services that he had been
13 employed at Pepe's Cabinets for approximately 12 years when, in truth, that business has only been
14 in operation for nine years, since 1998 (Pretrial Services Report, p. 4).

15      As further evidence of defendant's risk of flight, the government advised the magistrate judge
16 that defendant has three failures to appear based upon his various traffic violations in 1999, 2002,
17 and 2004 (B21).

18      Over the government's objection, the magistrate judge ordered defendant's release on a
19 $50,000 bond to be secured by $25,000 in equity through the posting of Carlos Fuentes' property
20 (B24, 32).[4]

21      The magistrate judge directed that defendant's common-law wife Maria Ramirez, an illegal
22 alien who has been charged in deportation proceedings, serve as defendant's custodian and also as

23

24      [4] As of the filing of this appeal, the government has not been provided with a copy of any
25 property documents establishing that Carlos Fuentes has equity in the amount of $25,000. Based
   upon the Pretrial Services report, not much is known about Mr. Fuentes, including the length of
26 time in which he has known the defendant and under what circumstances. In regards to criminal
   history, Mr,. Fuentes told Pretrial Services that he sustained a misdemeanor conviction in 1986
27 for which he was sentenced to two years probation. Mr. Fuentes claimed that he could not recall
28 the nature of the conviction.

1    surety on the $50,000 bond (B24, 32). In so ruling, the magistrate judge stated that defendant has

2    a 13-year history in this area and has a residence (B23). The magistrate judge opined that

3    defendant's immigration attorney has been successful "in obtaining at least some stay of the

4    immigration proceedings" against Maria Ramirez (B23). The magistrate judge further stated that

5    the immigration attorney "feels that given all the circumstances that there's most likely some

6    likelihood that Mr. Guzman-Baez will also be allowed to remain until such time as both

7    (unintelligible)" (B23). The magistrate judge stated that, if the immigration court decided to detain

8    the defendant, the government could place a detainer on him (B24).

9        The magistrate judge's ruling is erroneous. Assuming arguendo that defendant had first

10    entered the United States 13 years ago, his entire presence in the United States has been illegal and

11    replete with fraud and illegal activities. Further, defendant does not have a residence. At the time

12    of his arrest, defendant and his family resided at 3933 Midvale Avenue in Oakland, which they had

13    rented for a short time since September 1, 2006 (Exhibit H; Pretrial Services Report, p. 2). The

14    magistrate judge ordered that defendant remain in Ms. Ramirez's custody at 2272 86th Avenue in

15    Oakland, where Ms. Ramirez had only been residing with "friends" for two weeks since December

16    13, 2007 (B27; Exhibit H). Although the magistrate judge requested the telephone number of these

17    friends, no inquiry was made as to their identities, whether they have legal status in the United

18    States, or anything else (B27-28). As the government pointed out, defendant surrounds himself

19    with illegal aliens (B21). Moreover, as set forth in the Pretrial Services Report, defendant has

20    moved from place to place (B20; Pretrial Services Report, p. 2). Defendant and Maria Ramirez are

21    unemployed and have no permanent residence. The magistrate judge has ordered defendant to reside

22    with unknown people under unknown circumstances. Moreover, Ms. Ramirez, who was an

23    employee of Pepe's Cabinets, does not have the funds to pay a $50,000 bond because she is no

24    longer employed.

25        The government objected to an illegal alien functioning as the custodian and surety for the

26    defendant, who is also an illegal alien ( B34). The magistrate judge responded that he believed that

27    Ms. Ramirez currently has "temporary status" in the United States (B34). The magistrate judge's

28    comments disclose unfamiliarity with the immigration proceedings. Ms. Ramirez does not have

1   "temporary status" in the United States, nor is there a "stay" of her deportation proceedings.    On

2   December 21, 2007, Ramirez was arrested by ICE agents and served with a charging document and

3   notice to appear before the immigration court on March 6, 2008 (A7, B5-7; Exhibits F & G).    ICE

4   agents released Ms. Ramirez, who was seven months pregnant and not facing criminal charges, on

5   her own recognizance pending her first appearance before an immigration judge (A6-7; B6).    As the

6   government pointed out, the mere filing of an application for cancellation of removal does not confer

7   any legal status upon Ms. Ramirez (B34).

8         What may or may not happen in immigration court with respect to Ms. Ramirez's deportation

9   proceedings is irrelevant to the issue of defendant's flight risk in the pending criminal proceedings.

10  In any event, defendant and Ms. Ramirez are not similarly situated.    Defendant has been charged

11  with 27 violations of federal criminal law, while Ms. Ramirez is not facing criminal prosecution.

12        To make defendant's common-law wife Maria Ramirez, an illegal alien facing deportation,

13  the custodian and surety for defendant, an illegal alien whose charges in a federal criminal

14  prosecution include the harboring and employment of Ms. Ramirez, defies logic.    Equally beyond

15  comprehension is the magistrate judge's order that Ms. Ramirez notify Pretrial Services if defendant

16  fails to follow the terms and conditions of his bond (B30, 34).    In other words, the magistrate judge

17  has ordered one illegal alien to report her common-law husband, another illegal alien, to Pretrial

18  Services if their family, including their illegal alien son, decides to abscond and return to Mexico.

19  If released, defendant has everything to gain by moving his family back to Mexico to avoid federal

20  criminal prosecution.

21        The magistrate judge's speculation as to what might occur in immigration court, if defendant

22  were released on bond in the pending criminal matter, likewise has no relevance to the issue of

23  defendant's flight risk in the federal court proceedings.    In addition, the record shows that

24  defendant's immigration attorney never represented, nor could he, that defendant would likely be

25  permitted to remain in the United States.    In count nine of the indictment, defendant has been

26  charged with possession of a counterfeit immigration document, in violation of 18 U.S.C. § 1546(a),

27  based upon his possession of a fraudulent permanent resident card.    A conviction under this statute

28  constitutes an aggravated felony under 8 U.S.C. § 1101(a)(43)(P), which would render defendant

1  ineligible for cancellation of removal. See 8 U.S.C. § 1229b (a)(3) (an aggravated felony conviction

2  disqualifies an alien for cancellation of removal); Parrilla v. Gonzales, 414 F.3d 1038, 1041 (9th Cir.

3  2005).

4          The fallacy of the magistrate judge's ruling is further demonstrated by his acceptance of

5  defendant's self-serving position that, if an immigration judge detains the defendant, he will request

6  return to federal criminal detention so that he can earn jail-time credit (B24, 9, 11). The criminal

7  justice system and the laws governing issues of release and detention were not instituted for the

8  purpose of being manipulated by a criminal defendant for his own self-serving interests. In reality,

9  if a defendant is released on bond in the criminal prosecution, it is a foregone conclusion that an

10 immigration judge will be influenced by such a ruling and also release the defendant on bond. The

11 immigration attorney correctly stated that, if defendant were released on bond in the pending

12 criminal proceedings, the immigration court "certainly would take into consideration the fact" that

13 defendant has been released on bond in a federal criminal prosecution and the amount of that bond

14 (A15). The magistrate judge's release order will effectively guaranteed that defendant will be

15 released on bond in immigration court.

16         Significantly, if defendant is released on bond in the criminal prosecution, the United States

17 Attorney's Office will lose control of both defendant and the prosecution because it lacks jurisdiction

18 to interfere with an immigration judge's decision to deport the defendant, or the timing of that

19 deportation. Indeed, it is unlawful for ICE officials to detain an alien and otherwise interfere with

20 deportation proceedings for the sole purpose of pursuing a criminal prosecution.

21         As the magistrate judge repeatedly acknowledged, if an illegal alien is released to

22 immigration court based upon an ICE detainer, "he's gone, and then the government is unable to go

23 forward with their case" (B4). The magistrate judge described this "complicated dynamic" as a

24 "chicken and egg issue" (A7-8). The magistrate judge stated:

25             THE COURT: Getting him into immigration releases the district
              court's hold on your client. We can't get him back if they choose to
26            deport him right away. On the other hand, he can't be in front of an
              immigration judge for bond unless he's out of custody from us. So
27            it becomes a complicated dynamic that's difficult to solve" (A8).

28            THE COURT: But here's the issue. And this is one – you know, we
              go back and forth in these cases all the time. It's the same issue. It's

1   if I release him out of custody here, then I have a problem of him
    going before the immigration court downtown. And if they remand
2   him into custody, there's nothing to hold him, he's gone, and then the
    government is unable to go forward with their case. And so the court
3   is always leery of doing it (B4).

4   THE COURT: Now here's – here's the court's problem. And I
    believe it's correct. There's no way to fashion a bond that would
5   allow me to, quote, "let him go and hold onto him at the same time."
    I hate saying that. But what troubles the court is that Judge
6   Yamaguchi or Judge Murry [immigration judges], who have
    discretion in their courtroom to determine what they wish to do with
7   defendants that are before them, if I release him outright then I have
    no say over that and neither does Ms. Douglas. That's the – that's the
8   problem (B8-9).

9

10   Defendant is clearly a serious flight risk and should remain in detention pending the federal

11   criminal prosecution. There are no combination of conditions that would reasonably assure his

12   appearance at future court proceedings. The ineffectiveness of the magistrate judge's attempt to set

13   conditions of release for an illegal alien is further illustrated by his order that defendant surrender

14   all passports, visas, and travel documents (B29). As set forth in the Pretrial Services' report,

15   defendant admitted that he does not have any passports or travel documents (Pretrial Services

16   Report, p. 3). Illegal aliens do not have valid passports or travel documents.

## CONCLUSION

17   For the reasons set forth above, the United States respectfully submits that this Court should reverse

18   and vacate the magistrate judge's release order and direct that defendant remain in detention pending

19   trial.

20                         Respectfully submitted,

21                         JOSEPH P. RUSSONIELLO
22                         United States Attorney

23   `\22\08`

24   Dated                 DEBORAH R. DOUGLAS
                           Assistant United States Attorney
25

26

27

28

                                21