1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  DEBORAH R. DOUGLAS (NYBN 2099372)
   Assistant United States Attorney
5
      1301 Clay Street, Suite 340S
6     Oakland, California 94612
      Telephone: (510) 637-3680
7     Facsimile: (510) 637-3724
      E-Mail: deborah.r.douglas@usdoj.gov
8
   Attorneys for Plaintiff
9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                          OAKLAND DIVISION
12
   UNITED STATES OF AMERICA,        )   Nos. CR07-00797 DLJ; CR07-00794 DLJ
13                                   )
           Plaintiff,                )   GOVERNMENT'S OMNIBUS
14                                   )   OPPOSITION TO DEFENDANT'S
        v.                           )   MOTIONS TO (1) SUPPRESS EVIDENCE
15                                   )   OR, ALTERNATIVELY, FOR A FRANKS
   JOSE De JESUS GUZMAN-BAEZ,        )   HEARING, AND (2) FOR A BILL OF
16                                   )   PARTICULARS
           Defendant.                )
17  _____ )

18  **I.    INTRODUCTION**

19         Defendant has moved to suppress the evidence obtained pursuant to the search warrant and

20  all other fruits of the search arguing that the warrant was not supported by probable cause or,

21  alternatively, seeks a *Franks* hearing based upon his allegation that the search warrant affidavit

22  contains four material misstatements and omissions.   In a separate motion, defendant demands a

23  bill of particulars on the ground that the indictment does not provide him with adequate notice of

24  the charges.   For the reasons set forth below, the United States respectfully submits that both of

25  defendant's motions lack merit and should be denied.

26

27

28

CR007-00797 DLJ; CR07-00794 DLJ

1

## II.   BACKGROUND

2   On October 29, 2007, the Honorable Edward M. Chen, United States Magistrate Judge,

3   issued a warrant to search Pepe's Cabinets, a carpentry business owned by defendant at 1285 47th

4   Avenue #A, in Oakland, California. The supporting affidavit sets forth probable cause that

5   defendant was knowingly harboring, employing, and continuing to employ illegal aliens at Pepe's

6   Cabinets, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324a(a)(1), and 1324a(a)(2), respectively.

7   On November 6, 2007, the search warrant was executed at Pepe's Cabinets. On that same

8   date, defendant made post-Miranda inculpatory statements. Eight of defendant's employees also

9   made inculpatory statements against the defendant. Defendant and all of his employees have

10   admitted, inter alia, that they are illegal aliens.

11   ## III.   ARGUMENT

12   A. The Search Warrant Was Supported By Probable Cause

13   1. The Law Governing Search Warrants

14   The role of a magistrate judge issuing a search warrant is to make a practical, common-sense

15   decision whether, given the totality of the circumstances, there is a fair probability that contraband

16   or evidence of a crime will be found in a particular place. See United States v. Gourde, 440 F.3d

17   1065, 1069 (9th Cir. 2006) (en banc), quoting Illinois v. Gates, 462 U.S. 213, 246 (1983); United

18   States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (totality of circumstances includes reasonable

19   inferences); United States v. Chavez-Miranda, 306 F.3d 973, 978 (9th Cir. 2002) ("Under the totality

20   of the circumstances test, otherwise innocent behavior may be indicative of criminality when

21   viewed in context"). Neither certainty nor preponderance of the evidence is required. See United

22   States v. Gourde, 440 F.3d at 1069.

23   A reviewing court must uphold a search warrant, if under the totality of the circumstances,

24   the magistrate judge had a substantial basis for concluding that probable cause existed. See United

25   States v. Celestine, 324 F.3d 1095, 1102 (9th Cir. 2003); United States v. Kelley, 482 F.3d at 1050.

26   The courts are not to "flyspeck" the affidavit supporting a search warrant, but, rather, accord "great

27   deference" to the magistrate judge's determination. United States v. Gourde, 440 F.3d at 1069,

28

1    quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969); <u>United States v. Kelley</u>, 482 F.3d at

2    1050-51; <u>United States v. Hill</u>, 459 F.3d 966, 970 (9th Cir. 2006).

3        2. <u>Defendant's Arguments Lack Merit</u>

4        Defendant argues that the search warrant affidavit supports probable cause for all three

5    charged offenses, except for the element that he knew that his employees are illegal aliens ("or, for

6    the harboring offense, at least recklessly disregard the fact") (Defendant's Motion to Suppress, pp.

7    6-7). This argument fails because the totality of the circumstances set forth in the affidavit,

8    including reasonable inferences, establishes probable cause that defendant knew that his employees

9    are illegal aliens (Exhibit A [Search Warrant and Supporting Affidavit]).   For example, Pepe's

10   Cabinets submitted fraudulent reports to the California Employment Development Department

11   ("EDD"), which requires that California employers file quarterly reports ("DE 6") reporting the

12   identities and tax withholding for all employees (Affidavit ¶¶ 13 & 14).   The social security

13   numbers for defendant and all eleven employees reported to EDD in the year 2006, and the first two

14   quarters of 2007, were all fraudulent, including defendant's wife Maria Ramirez (Affidavit ¶ 14).

15       There is a reason why a fraudulent social security number was submitted for <u>every</u> single

16   name reported to EDD for this <u>entire</u> period. The Social Security Administration does not assign

17   social security numbers to illegal aliens. The only reasonable inference to draw from this 100%

18   fraudulent reporting to EDD is that defendant. the sole owner of Pepe's Cabinets, had knowledge

19   that his employees are illegal aliens. Moreover, information about the cooperating witness, who

20   has been an employee at Pepe's Cabinets since at least April 2006, was not submitted at all to EDD

21   (Affidavit ¶ 15).

22       The circumstances surrounding defendant's employment practices and the environment at

23   Pepe's Cabinets further establishes that defendant had knowledge about his illegal alien workforce

24   as follows (Affidavit ¶ 17):

25       •    The cooperating witness's hiring process at Pepe's Cabinets was verbal (Affidavit
              ¶ 17a);

26

27       •    The cooperating witness did not complete an employment eligibility verification (I-
              9) form, which is required by all employers to establish legal presence in the United
              States and eligibility to work (Affidavit ¶ 17a);

28

- The cooperating witness did not complete any paperwork for employment (Affidavit ¶ 17a);

- The cooperating witness did not provide identification to anyone at Pepe's Cabinets (Affidavit ¶ 17a);

- The cooperating witness was paid in cash every other week and was never been provided with a W-2 form (Affidavit ¶ 17c);

- The cooperating witness described the environment at Pepe's Cabinets where the employees, including defendant's wife Maria Ramirez, openly discussed their status as illegal aliens and how they entered the United States without inspection by immigration officials. Based on conversations with his co-workers, the cooperating witness knows that all eight Pepe's employees, including Froylan Flores who is currently on a leave of absence, are illegally present in the United States. All of the employees are from Mexico, except for Marcelino Llamas and Marvin Terezon, who are from Guatemala and El Salvador, respectively. In late 2006, Guzman hired Jaime Sandoval, who admitted to the cooperating witness that he is from Mexico and is illegally present in the United States. Even the two most recent employees whom Guzman reported to EDD in the second quarter of 2007, Maria D. Ramirez (Guzman's wife) and Michael Velascopantoja, discussed their status as illegal aliens. Ramirez told Pepe's employees how easy it was to cross the border from Mexico to the United States through Mexicali (a town situated close to the border). Ramirez stated that she jumped a fence and then crossed a sewer. During a conversation with Michael Velascopantoja ("Michelle"), Velascopantoja admitted to the cooperating witness that he is an illegal alien who crossed the border in the desert (Affidavit ¶ 17b);

- On March 22, 2007, the cooperating witness asked Guzman if he would hire a friend who had just arrived from Mexico and "doesn't have papers." "Papers" in street vernacular means immigration documents that establish evidence of authorized stay in the United States (e.g. permanent resident or green card). Guzman stated that he wanted to first determine the work status of another employee who was recently hospitalized (Affidavit ¶ 17d);

In addition, on July 27, 2007, defendant and his employee and passenger, Maria Guadalupe Gamino-Perez ("Gamino"), attempted to enter the military base at Coast Guard Island in a blue Chevy Tahoe registered to Guzman (Affidavit ¶ 19). The Coast Guard discovered that defendant was driving with a suspended license and that his registration tags had expired. Defendant and Gamino provided Mexican Consular identification cards (Affidavit ¶ 19). Defendant and Gamino both admitted to the Coast Guard that they were born in Mexico and did not have legal documents to be present in the United States (Affidavit ¶ 19). With full knowledge that Gamino is an illegal alien, defendant continued to employ her (Affidavit ¶ 20).

On October 18, 2007, ICE agents showed the cooperating witness individual photographs of Guzman and seven employees, including Maria Guadalupe Gamino-Perez and defendant's wife

Maria Ramirez, taken at Pepe's the day before (Affidavit ¶ 23).  The cooperating witness identified each employee by name and confirmed that Guzman and all seven identified employees are illegal aliens, including Maria Guadalupe Gamino-Perez and defendant's wife Maria Ramirez (Affidavit ¶ 23).  It simply defies logic that defendant, an illegal alien and the sole owner of Pepe's Cabinets, would lack knowledge that his employees are illegal aliens under circumstances where 100% of the workforce consists of illegal aliens, including his own wife and Leopoldo Perez, both of whom resided with defendant.

The magistrate judge had all of the facts contained in the affidavit before him and reasonably concluded that there was probable cause to support the charged offenses.  Defendant does not claim that the magistrate judge abandoned his detached and neutral role, or that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable."  United States v. Huggins, 299 F.3d 1039, 1045-46 (9th Cir. 2002), citing United States v. Leon, 468 U.S. 897, 923 (1984) (quoting Brown v. Illinois, 422 U.S. 590, 611 (1975)).  Instead, defendant engages in frivolous "flyspeck" arguments that the courts have disapproved.  See United States v. Gourde, 440 F.3d at 1069;  United States v. Kelley, 482 F.3d at 1050-51.

First, defendant states that "the EDD records from 2006 and 2007 were signed and prepared not by Mr. Guzman-Baez but by professional preparers" (Defendant's Suppression Motion, p. 3).  Defendant attached four quarterly reports for 2006 and the first two quarters of 2007 (Defendant's Suppression Motion [Exhibit B]).  All six reports were prepared and signed on behalf of "Jose De Jesus Guzman, Pepe's Cabinets" by a professional preparer.  The first quarterly report for 2006 was also signed by the defendant.  In determining probable cause, it makes no difference whether the defendant personally prepared the EDD reports, or hired a professional to prepare the reports on his behalf.  It is reasonable to conclude that all of the reports were prepared based upon information provided by defendant, the sole owner of Pepe's Cabinets, or at his instruction.  See United States v. Burnes, 816 F.2d 1354, 1358 (9th Cir. 1987) ("The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit").

Second, defendant argues that "[t]here is no indication in the affidavit that Mr. Guzman-Baez participated in or even heard" the various conversations among his employees in which they

1   discussed their illegal presence in the United States (Defendant's Suppression Motion, p. 4). It is
2   clear from the affidavit that the environment at Pepe's Cabinets, where the owner and every
3   employee are illegal aliens, facilitated open discussions about the status of employees as illegal
4   aliens and how they entered the United States without inspection by immigration officials. For
5   example, as the cooperating witness revealed, defendant's wife Maria Ramirez told her co-workers
6   how easy it was for her to cross the border from Mexico to the United States through Mexicali (a
7   town situated close to the border) (Affidavit ¶ 17b). Ramirez stated that she jumped a fence and
8   then crossed a sewer (Affidavit ¶ 17b). Given the environment at Pepe's Cabinets, it simply defies
9   belief that defendant would not know that his employees are illegal aliens, including his own wife.

10          Third, defendant points to the cooperating witness's statement, as contained in the affidavit,
11   that he had asked the defendant to hire his illegal alien friend and defendant responded that he
12   wanted to first determine the work status of another employee who was recently hospitalized
13   (Defendant's Suppression Motion, p. 4).   Defendant then claims that this statement contradicts
14   defendant's actual words, as captured on an audio recording and documented in ICE's Report of
15   Investigation, "that he wants to see what happens with the old man" (Defendant's Suppression
16   Motion, p. 4). However, defendant has omitted that portion of the ICE report that is consistent with
17   the statement contained in the affidavit. The ICE report explicitly states (Defendant's Suppression
18   Motion [Exhibit D]):

19                  On March 22, 2007, at approximately 5:00 pm, [the cooperating
20                  witness] approached Guzman outside Pepe's and asked Guzman if he
                    would hire a friend, who just came from Mexico and "doesn't have
21                  papers." In Spanish street vernacular, "papers" is a commonly used
                    term for immigration documents, which establish evidence of
22                  authorized stay in the United States (e.g. permanent resident or green
                    card).

23                  Guzman said that he wants to see what happens with the old man,
                    referring to Marcelino Llamas who was recently hospitalized for a
24                  heart condition.

25          Fourth, defendant argues that, although the affidavit represents that the cooperating witness
26   has been an employee at Pepe's Cabinets since April 2006, a rental apartment application states that
27   the cooperating witness has been employed at Pepe's Cabinets for three years (Defendant's
28   Suppression Motion, p. 4). According to the defendant, the statement on an unsworn rental

1  application constitutes a "material false statement" for purposes of the search warrant,
2  notwithstanding that the rental application is not part of the search warrant papers. Contrary to
3  defendant's contention, the statement on the rental application does not negate that the cooperating
4  witness was an illegal alien employed by defendant at Pepe's Cabinets. The affidavit supporting
5  the search warrant accurately reflects that the cooperating witness has been employed at Pepe's
6  Cabinets since April 2006.

7  Fifth, defendant contends that there are no facts in the affidavit to support that defendant had
8  knowledge that Maria Guadalupe Gamino-Perez was an illegal alien while employed at Pepe's
9  Cabinets. Although acknowledging that both he and Gamino-Perez provided the Coast Guard with
10  Mexican consular identification cards and admitted that they are not legally in the United States,
11  defendant argues that the "affidavit does not say that Mr. Guzman-Baez was present when Ms.
12  Gamino-Perez allegedly made this admission" (Defendant's Suppression Motion, p. 5). The facts
13  and circumstances set forth in the affidavit support that defendant was present when Ms. Gamino-
14  Perez handed her Mexican Consular identification card to a Coast Guard officer and admitted that
15  she was born in Mexico and did not have legal documents to be present in the United States (¶ 19).
16  The conclusions made by the affiant "with respect to those facts were reasonable and based on
17  experience." See United States v. Burnes, 816 F.2d at 1358.

18  Defendant does not claim that he lacked knowledge that Ms. Gamino-Perez was an illegal
19  alien while employed at Pepe's Cabinets. Instead, in his purported declaration, defendant
20  disingenuously claims that he did not see or hear anything regarding Ms. Gamino-Perez's status in
21  the United States when he and Ms. Gamino-Perez were stopped by Coast Guard Security Police
22  when they attempted to enter Coast Guard Island on July 27, 2007. At the threshold level,
23  defendant's "declaration" is unsigned and therefore legally invalid. Moreover, on its face,
24  defendant's statement is unbelievable.

25  As set forth in his declaration, the case agent interviewed the Coast Guard Security Police
26  Officer who stopped defendant and Ms. Gamino-Perez at the main security gate of Coast Guard
27  Island (Exhibit B). The Coast Guard Officer stated, inter alia:

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> For security reasons, every person attempting to enter the military base at Coast Guard Island is required to provide a government-issued photo identification. In defendant's presence, Officer Bermudez asked Ms. Gamino-Perez for her identification. When Ms. Gamino-Perez gave him a puzzled look, Officer Bermudez asked defendant if Ms. Gamino-Perez had identification. Defendant said something to Ms. Gamino-Perez in Spanish and Ms. Gamino-Perez then handed Officer Bermudez her Mexican Matricula card.

> Officer Bermudez asked defendant if Ms. Gamino-Perez had any other identification. Defendant again spoke to Ms. Gamino-Perez in Spanish and he then responded "no." Officer Bermudez asked defendant "then you know she's an illegal alien." Defendant acknowledged yes by shaking his head up and down.

The case agent's declaration is submitted for the sole purpose of showing that the statements made in defendant's unsigned declaration are untrue. The government does not seek to use the case agent's declaration to bolster the facts set forth in the search warrant affidavit. An objectively reasonable review of the four corners of the affidavit abundantly supports the magistrate judge's determination that there was probable cause that defendant knew that his employees are illegal aliens. That decision should be accorded "great deference." United States v. Gourde, 440 F.3d at 1069, quoting Spinelli v. United States, 393 U.S. 410, 419 (1969); United States v. Kelley, 482 F.3d at 1050-51; United States v. Hill, 459 F.3d at 970.

Finally, the Fourth Amendment does not require the suppression of evidence where, as here, the search was conducted in good faith reliance on a facially valid warrant. See United States v. Crews, 502 F.3d 1130, 1135-37 (9th Cir. 2007); United States v. Huggins, 299 F.3d at 1046-47.

B. Defendant Has Failed to Meet the Threshold Standard for a Franks Hearing

To obtain suppression of evidence, a defendant must make a substantial showing, by a preponderance of the evidence, that (i) the affidavit contained false statements or omissions; (ii) the false statements or omissions were material to the issue of probable cause (i.e., the facts in the affidavit would not support probable cause without the false statements or omissions); and (iii) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

No evidentiary hearing is warranted under *Franks* unless the defendant:

i.      Makes specific allegations that indicate portions of the warrant claimed to be false;

ii.     Alleges deliberate falsehood or reckless disregard for the truth;

iii.    Accompanies the allegations with a detailed offer of proof, preferably in the form of affidavits;

iv.     Provides an offer of proof that challenges *the veracity of the affiant and not that of his informant*, and

v.      Shows that the challenged statements in the affidavit were necessary to the finding of probable cause.

See United States v. Kiser, 716 F.2d 1268, 1271 (9th Cir. 1983) (emphasis added); United States v. Chavez-Miranda, 306 F.3d at 979 ("Given the assumption of validity underlying a supporting affidavit, a party moving for a *Franks* hearing must submit 'allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.' Furthermore, the movant must show that any omitted information is material. The movant bears the burden of proof and must make a substantial showing to support both elements") [internal citations omitted].

Defendants rarely make the showing required to obtain a *Franks* hearing. See, e.g., United States v. Chavez-Miranda, 306 F.3d at 979-80 (*Franks* hearing denied); United States v. Reeves, 210 F.3d 1041, 1044-46 (9th Cir. 2000) (*Franks* hearing denied).

Similarly, defendant's request for a *Franks* hearing should be denied because he has completely failed to meet his burden of proof. Defendant frivolously alleges that the search warrant affidavit contains four material misstatements and omissions. All of defendant's allegations are without merit and have been discussed above.

C.     Defendant's Motion for a Bill of Particulars Should Be Denied

The principle purpose of an indictment is to "provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense and plead double jeopardy at a later prosecution." United States v. Lane, 765 F.2d 1376, 1380 (9th Cir. 1985). The government is not required to "allege its theory of the case or supporting evidence, but only the 'essential facts necessary to apprise a defendant of the crime charged.' " United States v. Buckley,

1    689 F.2d 893, 897 (9th Cir. 1982) (quoting United States v. Markee, 425 F.2d 1043, 1047-48 (9th

2    Cir. 1970).

3        Defendant's charges include eight counts of harboring illegal aliens, in violation of 8 U.S.C.

4    § 1324(a)(1)(A)(iii).   The eight harboring counts are adequately specified in the indictment and

5    track the statutory language as follows (Exhibit C):

6             Beginning at a time unknown, but not later than in or about August

7             2007, and continuing until on or about November 6, 2007, in the
             Northern District of California, the defendant,

8                JOSE DE JESUS GUZMAN-BAEZ,

9             knowing and in reckless disregard of the fact that an alien, [name of

10             specific alien], had come to, entered, and remained in the United
             States in violation of law, did knowingly and intentionally conceal,

11             harbor, and shield the alien from detection, and attempted to conceal,
             harbor, and shield the alien from detection, in any place, in

12             violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

13        Defendant has moved for a bill of particulars to compel the government to explain "its

14    theory of harboring for each harboring offense" (Defendant's Motion, p. 2).   Defendant contends

15    that the indictment provides "inadequate notice" of the charges and provides no further information

16    to indicate how he harbored each of the named aliens (Defendant's Motion, pp. 2-3).   However,

17    defendant "fails to demonstrate surprise, prejudice, or an increased risk of double jeopardy

18    stemming from the alleged shortcomings of the indictment." United States v. Burt, 765 F.2d 1364,

19    1367 (9th Cir. 1985).   The indictment apprises defendant of the charges against him with sufficient

20    clarity and enables him to prepare an adequate defense.   Nothing more is required.   See United

21    States v. DiCesare, 765 F.2d 890, 897-98 (9th Cir.) (bill of particulars not warranted when defendant

22    seeks to obtain co-conspirator names, exact dates and overt acts), amended on other grounds, 777

23    F.2d 543 (1985).

24        What the defendant is seeking is evidentiary detail and an undue restriction on the

25    Government's theory of prosecution and proof at trial.   The details sought by the defendant ignore

26    the principles governing bill of particulars.

27        The courts have imposed a high standard that must be met before a bill of particulars will

28    be granted.   Such relief is required only where the charges in the indictment are so general that

1    they do not advise the defendant of the crimes of which he is charged.   See United States v.

2    Federbush, 625 F.2d 246, 252 (9th Cir. 1980) (the conduct charged was adequately specified in the

3    indictment).   A bill of particulars is not a discovery tool (United States v. Colson, 662 F.2d 1389,

4    1391 [11th Cir. 1981]), nor a device by which the government may be required to state its legal or

5    evidentiary theory as to the means by which the defendant committed specific criminal acts.  See

6    United States v. Buckley, 689 F.2d at  897.  A bill of particulars is not intended to give a preview

7    of the government's case, or to unduly restrict the government in presenting its proof at trial.

8         A bill of particulars is intended "to minimize the danger of surprise at trial and to provide

9    sufficient information on the nature of the charges to allow preparation of a defense." United States

10   v. Mitchell, 744 F.2d 701, 705 (9th Cir. 1984).  The purposes of a bill of particulars "are served if

11   the indictment itself provides sufficient details of the charges and if the Government provides full

12   discovery to the defense."  Id.; United States v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983) (full

13   discovery obviates the need for a bill of particulars); United States v. Ayers, 924 F.2d 1468, 1483-

14   84 (9th Cir. 1991) (affirming the denial of a motion for bill of particulars where the indictment

15   identified details of the charged crime and where the Government provided significant discovery).

16        In addition to the charges in the indictment, the government has provided defendant with

17   substantial discovery consisting of an audio recording and 582 pages of documents, including

18   numerous investigatory reports. Moreover, defendant has access to all of the documentary evidence

19   seized during the execution of the search warrant.  Further, the government has filed two affidavits

20   set forth evidence to support the same charges in the criminal complaint and the search warrant.

21   For example, the search warrant affidavit states, inter alia, that "there is probable cause to believe

22   that Guzman has knowingly employed and harbored illegal aliens and that he has continually failed

23   to report accurate information about his workforce to government agencies in order to conceal,

24   harbor and shield his illegal alien employees from detection. There is also probable cause to believe

25   that a search of Pepe's Cabinets will reveal that Guzman does not complete I-9 forms and that he

26   has acted with the intent to facilitate the unlawful presence of illegal aliens" (Affidavit ¶ 7).

27        Defendant has received the requisite notice of the crimes of which he is charged  by way of

28   the indictment, the substantial discovery provided, and the two filed affidavits.  In view of the

information that has already been made available, the defendant cannot credibly argue that he is unable to comprehend the charges sufficiently to prepare a defense and to avoid surprise. Defendant's demand for a bill of particulars is not justified and should be denied.

### CONCLUSION

For the reasons set forth above, the United States respectfully submits that defendant's motion to suppress evidence or, alternatively, request for a *Franks* hearing should be denied. Defendant's demand for a bill of particulars should also be denied

Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney

3/28/08
Dated

DEBORAH R. DOUGLAS
Assistant United States Attorney

CR007-00797 DLJ; CR07-00794 DLJ          12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

Search Warrant and Supporting Affidavit

CR007-00797 DLJ; CR07-00794 DLJ

AO 93 (Rev. 5/85) Search Warrant

ORIGINAL
FILED

# United States District Court

NORTHERN                    **DISTRICT OF**                    CALIFORNIA

NOV X 9 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EMC

WDB

In the Matter of the Search of
(Name, address or brief description of the person or property to be searched))

Pepe's Cabinets
1285 47th Avenue, #A
Oakland, California

**SEARCH WARRANT**

CASE NUMBER:    4 - 0 7 - 7 0 6 4

OAKLAND VENUE
[FILED UNDER SEAL]

TO: U.S. Immigration and Customs Enforcement (ICE)          and any Authorized Officer of the United States

Affidavit(s) having been made before me by _Special Agent Michael Barge_          who has reason to
                                              Affiant

believe that [ ] on the person of or [✓] on the premises known as (name, description and/or location)
See Attachment A for description of premises to be searched

in the NORTHERN                    District of CALIFORNIA                    there is now
concealed a certain person or property, namely (describe the person or property)

and C  fee

See Attachment B for the list of items to be siezed

which constitutes evidence of crime,contraband,fruits/crime,items possessed,property designed/used/crime
                  (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rule of Criminal Procedure)
of a criminal violation(s) of Title 8_____ , United States Code, Section(s) 1324 (a) (1) (A) (iii), 1324a (a) (1) (A)
                                                                               and 1324a (a) (2)

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this
warrant.
YOU ARE HEREBY COMMANDED to search on or before _____ 11/8/07 _____
                                                                          Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search  (in the daytime--6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established), and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to    Edward M. Chen _____as required by law.
                          U.S. Judge or Magistrate Judge

10/24/07 @ 1:15 pm

Date and Time Issued

_Edward M. Chen_
Name and Title of Judicial Officer

at _San Francisco, CA_
   City and State

Signature of Judicial Officer

AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

NORTHERN _____    DISTRICT OF    CALIFORNIA _____

| | |
|---|---|
| In the Matter of the Search of <br> (Name, address or brief description of person, property or premises to be searched) <br><br> Pepe's Cabinets <br> 1285 47th Avenue, #A <br> Oakland, California | **APPLICATION AND AFFIDAVIT _EMC_** <br> **FOR SEARCH WARRANT _WDB_** <br><br> Case Number:  4 - 0 7 - 7 0 6 4 <br> OAKLAND VENUE <br><br> [FILED UNDER SEAL] |

I,  Michael Barge _____ being duly sworn depose and say:

I am a(n)  Special Agent, U.S. Immigration and Customs Enforcement (ICE) _____ and have reason to believe
Official Title

that ☐ on the person of or  ☑ on the property or premises known as (name, description and/or location)

See Attachment A for description of premises to be searched

in the  NORTHERN _____    District of    CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B for the list of items to be seized

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence of crime, contraband, fruits of crime, items illegall possessed, property designed/used for crime,

concerning a violation of Title  8 _____ United States code, Section(s) 1324(a)(1)(A)(iii),1324a(a)(1)(A)
The facts to support a finding of probable cause are as follows:                 and 1324a(a)(2)

See Attached Affidavit of Special Agent Michael Barge

Continued on the attached sheet and made a part hereof:     ☑ Yes     ☐ No

Approved
As To  ～～～～～～～～～～～～～～
Form: Deborah R. Douglas
AUSA

Signature of Affiant

Sworn to before me and subscribed in my presence,

10/29/07 _____    at    San Francisco,     California
Date                                            City                    State

Edward M. Chen          U.S. Magistrate Judge     _____
Name of Judge           Title of Judge            Signature of Judge

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, MICHAEL BARGE, being duly sworn, state as follows:

## I.     AGENT'S BACKGROUND AND EXPERIENCE

1.   I am a Special Agent with the United States Immigration and Customs Enforcement ("ICE") and have been so employed for over three years. I am currently assigned to the Worksite Enforcement Unit in San Francisco. As part of my duties, I investigate violations involving the knowing harboring and employment of illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) [Harboring of Illegal Aliens] and 8 U.S.C. § 1324a [Employment of Illegal Aliens]. I have been assigned to or have assisted in numerous investigations relating to immigration matters throughout my career.

2.   Through training and experience, I am aware that all employers are responsible to ensure that each employee, U.S. citizen or not, is authorized for employment in the United States. Employers are required to complete and retain employment eligibility verification (I-9) forms for all employees hired after November 6, 1986. An employer is obligated to review documents that prove a newly hired employee's identity and eligibility to work. These documents may include a permanent resident card ("green card") or an employment authorization card and a social security card. Aliens legally present in the United States may apply for these documents.

3.   As a federal law enforcement officer, I am authorized to investigate violations of federal law and to execute search warrants issued under the authority of the United States.

## II.    PURPOSE OF THE SEARCH WARRANT

4.   This affidavit is made in support of a warrant to search the premises of Pepe's Cabinets ("Pepe's"), a carpentry business located at 1285 47th Avenue #A, Oakland, California, whose owner and employer is Jose De Jesus Guzman-Baez, a/k/a, Jose De Jesus Guzman, a/k/a Jose Guzman ("Guzman"). The premises to be searched is described more particularly in Attachment A, which is attached hereto and fully incorporated herein.

5.   There is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises, described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 8 U.S.C. § 1324(a)(1)(A)(iii) [Harboring of Illegal Aliens] and 8 U.S.C. § 1324a (a)(1)(A) and § 1324a (a)(2) [Employment of Illegal Aliens].

6.   The information contained in this affidavit is known to me as a result of my personal participation in this investigation or was related to me by other law enforcement officers as well as a confidential informant who is employed at Pepe's Cabinets; physical surveillance; administrative subpoenas; website inquiries; and immigration and other records.

During the course of this investigation, I have consulted with ICE agents who have conducted numerous worksite investigations and have participated in hundreds of search and arrest warrants resulting in successful federal prosecutions. This affidavit is intended to show that there is probable cause for issuance of the search warrant and does not purport to set forth all of the evidence gathered to date in this investigation.

7. Based upon the following facts, my experience and training, and the experience and training of other ICE agents with whom I have consulted, there is probable cause to believe that Guzman has knowingly employed and harbored illegal aliens and that he has continually failed to report accurate information about his workforce to government agencies in order to conceal, harbor and shield his illegal alien employees from detection. There is also probable cause to believe that a search of Pepe's Cabinets will reveal that Guzman does not complete I-9 forms and that he has acted with the intent to facilitate the unlawful presence of illegal aliens.

## III.   APPLICABLE STATUTES

### 8. Unlawful Employment of Aliens

#### a.   Harboring Illegal Aliens

8 U.S.C. § 1324(a)(1)(A)(iii) makes it a crime to conceal, harbor, or shield from detection, or to attempt to conceal, harbor, or shield from detection, an alien in any place, knowing or in reckless disregard of the fact that the alien has come to, entered, or remains in the United States in violation of law.

#### b.   Employment of Illegal Aliens

(1) 8 U.S.C. § 1324a(a)(1)(A) makes it a crime for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien. The term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either an alien lawfully admitted for permanent residence, or authorized to be so employed by chapter 12 of Title 8 of the United States Code, or by the Attorney General.

(2) 8 U.S.C. § 1324a(a)(2) makes it a crime for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is, or has become, an unauthorized alien with respect to such employment.

## IV.    **FACTS SUPPORTING PROBABLE CAUSE**

9.  In July 2006, the ICE Special Agent in Charge of the San Francisco Field Office received information from the Department of Homeland Security's ICE tip-line that Guzman is employing approximately 20 illegal aliens at Pepe's Cabinets, 1285 47th Avenue #A, Oakland, California.    The caller identified Guzman as an illegal alien who pays his undocumented workforce in cash.

10.  On November 15, 2006, ICE Special Agent Michael Ertz and this affiant entered the business at Pepe's in an undercover capacity as potential customers.  Employees directed this affiant into the back office where I encountered an unidentified Hispanic woman working at a desktop computer.  The woman introduced this affiant to the owner, whom I immediately recognized as Guzman based on a California Department of Motor Vehicles driver's license (B6731455) photograph. This affiant received a Pepe's business card bearing the name Jose Guzman.    When this affiant asked the owner, "who is Jose Guzman?," Guzman responded, "That's me," and then explained that his nickname is "Pepe."

11.  On April 4, 2007, this affiant followed Guzman to his residence at 3933 Midvale Avenue, Oakland, California.    A check with the United States Postal Service revealed that the following individuals received mail at 3933 Midvale Avenue, Oakland, California: Jose De Jaz Guzman Baez, Ma De Jesus Ramirez, Maria A. Ramirez (Guzman's wife), Leopoldo Perez-Cruz (Guzman's employee), and Octavio E. Jauregui (identified as Guzman's landlord).

12.  This affiant has obtained information from the City of Oakland Business Tax Office regarding required annual filings from Pepe's since its inception in November 1998 through 2005.  Guzman has been the sole owner of Pepe's and has claimed no more than one full-time employee. Guzman provided the Business Tax Office with Social Security number 672-90- 9824.

13.  California employers must file quarterly reports ("DE 6") with the California Employment Development Department ("EDD") reporting the identities and tax withholding for all employees.  This affiant has obtained a copy of EDD records for the first quarter of 2006 (beginning in January 2006) through the second quarter of 2007.  As an example, Guzman reported Victor Castro, Guillermo Hernandez, Francisco Velasco as Pepe's employees in the first quarter of 2006.  For the most recent quarter (second quarter of 2007), Guzman reported Maria G. Gamino, Leopoldo Perez, Maria D. Ramirez (Guzman's wife), Marvin Terezon, and Michael Velascopantoja as Pepe's employees.

3

14. Information obtained from the Social Security Administration ("SSA") reveals as follows:

a. Guzman and all seven employees reported to in the year 2006 used social security numbers that appear to be fraudulent because they do not match SSA records. Of eight social security numbers submitted to EDD (for Guzman and seven employees), five numbers do not match the person who used them and three are invalid (meaning an impossible number or one that has not yet been assigned). Social Security number, 672-90- 9824, used by Guzman is also invalid. The seven reported employees are Victor Castro, Guillermo Hernandez, Francisco Velasco, Ana Buenrostro, Leopoldo Cruz, Yeni Lopez, and Fernandez Gomez.

b. According to EDD, two additional employees, Marvin Terezon and Maria Guadalupe Gamino, were reported by Guzman as commencing employment at Pepe's in the first quarter of 2007. Social Security Administration checks reveal that the social security numbers that Guzman submitted to EDD for Terezon and Gamino are fraudulent. Based on EDD records for the second quarter of 2007, Guzman reported two additional employees, Maria D. Ramirez (Guzman's wife) and Michael Velascopantoja. Social Security Administration checks reveal the social security numbers that Guzman submitted to EDD for Ramirez and Velascopantoja are fraudulent.

15. On December 5, 2006, ICE Special Agent David Moss and this affiant interviewed and obtained a sworn statement from a cooperating witness, who is an illegal alien employed at Pepe's since April 2006. Earlier that morning, the cooperating witness had been arrested outside his apartment and admitted to agents that he is illegally present in the United States. The cooperating witness is a Mexican citizen who last entered the United States by crossing the border between the United States and Mexico without inspection by an immigration officer. This investigation reveals that, although the cooperating witness has been employed at Pepe's since April 2006, Guzman has not reported him as an employee to EDD.

16. The cooperating witness has no criminal history and no promises were made to him. The cooperating witness has been granted deferred action and short-term employment authorization for himself and his wife. Deferred action in this context means that for a temporary period of one year, with the possibility of extensions, ICE will not seek to remove the cooperating witness or his wife from the United States. Deferred action was granted based on the witness' cooperation with this investigation and the medical condition of a family member. As of this date, only the wife has received an employment authorization card.

17. During this investigation, the cooperating witness has continued to work at Pepe's and has provided information about Pepe's employees, including their names, countries of origin, and how they traveled to and from work. The cooperating witness informed this affiant as follows:

a. Guzman hired the cooperating witness in April 2006 to work at Pepe's as a carpenter for $10.00 per hour. This affiant asked the cooperating witness if he had filled out an employment eligibility verification (I-9) form to work at Pepe's and showed him a copy of the form. After reviewing the I-9 form, the cooperating witness responded, "No." The cooperating witness stated that his hiring process at Pepe's was "verbal" and he did not complete paperwork or provide identification to anyone at Pepe's. The cooperating witness further stated that, while working at Pepe's, he has never been provided with a W-2 form.

b. It is common for Pepe's employees to describe to each other how they arrived in the United States. Based on conversations with his co-workers, the cooperating witness knows that all eight Pepe's employees, including Froylan Flores who is currently on a leave of absence, are illegally present in the United States. All of the employees are from Mexico, except for Marcelino Llamas and Marvin Terezon, who are from Guatemala and El Salvador, respectively. In late 2006, Guzman hired Jaime Sandoval, who admitted to the cooperating witness that he is from Mexico and is illegally present in the United States. Even the two most recent employees whom Guzman reported to EDD in the second quarter of 2007, Maria D. Ramirez (Guzman's wife) and Michael Velascopantoja, discussed their status as illegal aliens. Ramirez told Pepe's employees how easy it was to cross the border from Mexico to the United States through Mexicali (a town situated close to the border). Ramirez stated that she jumped a fence and then crossed a sewer. During a conversation with Michael Velascopantoja ("Michelle"), Velascopantoja admitted to the cooperating witness that he is an illegal alien who crossed the border in the desert.

c. Pepe's has a timecard system to track hours worked and every other week Guzman calls each employee, individually, into his office to pay him or her. Guzman pays the cooperating witness $800.00 in cash every other week. The cooperating witness knows three workers who are paid by check: Fernando Gomez, Leopold Perez, and Francisco Velasco. Leopoldo Perez showed the cooperating witness a check after being paid by Guzman. Information from EDD for the third quarter of 2006 reveals that Pepe's had reported wages to Fernando Gomez, Francisco Velasco, and an individual named Leopoldo Perez Cruz. On June 12, 2007, the cooperating witness told this affiant that, for the last two months, Leopoldo Perez Cruz had been living at and renting a room inside Guzman's residence at 3933 Midvale Avenue in Oakland.

d. On March 22, 2007, the cooperating witness asked Guzman if he would hire a friend who had just arrived from Mexico and "doesn't have papers." "Papers" in street vernacular means immigration documents that establish evidence of authorized stay in the United States (e.g. permanent resident or green card). Guzman stated that he wanted to first determine the work status of another employee who was recently hospitalized. Nothing further was discussed.

e. The cooperating witness stated that Guzman's cell number is (510) 206-4802. AT&T records confirm that cell phone number (510) 206-4802 is subscribed to Jose

Baez, who provided AT&T with California driver's license number B6731455 and Social Security number 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. The photograph from California driver's license number B6731455 is the same photograph that this affiant used to confirm Guzman's identity on November 15, 2006. Social security number 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 is the same fraudulent social security number that Guzman has provided to the City of Oakland Business Tax Office and the California EDD in connection with his business at Pepe's.

18. On July 27, 2007, this affiant received a phone call from the cooperating witness who stated that Guzman's wife, Maria Ramirez, came into Pepe's that morning. Ms. Ramirez told the employees that immigration officials had arrested Guzman and confiscated his blue Tahoe vehicle. The cooperating witness stated that Guzman arrived at Pepe's later that day.

19. On August 1, 2007, this affiant received an incident report from the U.S. Coast Guard ("USCG") Security Police at Coast Guard Island in Alameda, CA. The report reveals as follows:

a. On July 27, 2007, Guzman and Maria Guadalupe Gamino-Perez ("Gamino") attempted to enter Coast Guard Island in a blue Chevy Tahoe registered to Guzman. The blue Tahoe had expired registration tags. The cooperating witness, EDD records checks, and surveillance all confirm that Ms. Gamino is an employee of the Pepe's business.

b. USCG officers contacted the Alameda Police Department after determining that Guzman's California driver's license (B6731455) had been suspended.

c. Alameda Police Officer McManamin responded and gave Guzman a citation for driving with a suspended license. The blue Tahoe was impounded and Guzman was released to USCG officers.

d. After Guzman and Ms. Gamino provided Mexican Consular identification cards, USCG Officer Lualemaga completed immigration questionnaires. Guzman and Ms. Gamino admitted that they were born in Mexico and did not have legal documents to be present in the United States. USCG officers later released Guzman and Ms. Gamino with a warning.

20. With full knowledge that Ms. Gamino is an illegal alien, Guzman has continued to employ her.

21. Pepe's website lists its e-mail address as pepescabinets@sbcglobal. On September 12, 2007, this affiant received information from AT&T Internet Services (Yahoo and AT&T merged in November 2005) in response to a subpoena for subscriber or customer information on e-mail account pepescabinets@sbcglobal.net. According to AT&T, pcpescabinets@sbcglobal.net is subscribed to Jose Guzman at his business address: Pepe's

Cabinets, 1285 47th Avenue, Oakland, California; account no. 2518768; phone: (510) 536-0731.

22. On October 4, 2007, from approximately 7:00 a.m. to 9:30 a.m., this affiant and other agents placed the Pepe's business under surveillance and took photographs of employees as they entered or exited the building.   Additional photographs were taken on October 17, 2007.

23. On October 18, 2007, this affiant, together with ICE Special Agent David Moss and Investigative Assistant Teresa Alleyne, showed the cooperating witness individual photographs of Guzman and seven employees, including Maria Ramirez (Guzman's wife) and Maria Guadalupe Gamino-Perez, taken at Pepe's the day before.  The cooperating witness identified each employee by name and confirmed that Guzman and all seven identified employees are illegal aliens.

V.   **ADDITIONAL TRAINING AND EXPERIENCE**

24.  Based on the foregoing facts, my experience and training, and the experience and training of other ICE agents with whom I have consulted, there is probable cause to believe that the following evidence, as described in Attachment B, will be found at the search location, as described in Attachment A, and is relevant to this application for a search warrant.

A.  Records and Tangible Items

(1)  Employee and personnel records and documents, more particularly described as employment applications, time cards, payroll records, payroll stubs, payroll checks, withholding records and statements, correspondence with payroll processing companies, workers compensation records and claims, identification checks, I-9 forms, work permits, job applications, federal and state required filings, employment agency referral slips, employment agency documents, personnel rosters, work schedules, dates of employment, and any other employee-related records, including financial agreements, promissory or other notes, and  correspondence between employees and employers. Employee records, as described above, may be in any form, including computerized, electronic, or hard paper copies;

(2)  Documents, correspondence and other items between Pepe's and/or its owner(s) and the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Social Security Administration, Internal Revenue Service, and/or other federal, state or local agency, including the California Employment Development Department and the City of Oakland Business Tax Office, and all other documents, records, correspondence, and notes related to employment, immigration status, and financial and/or business activities;

7

(3) Documents, records, correspondence, and notes related to Pepe's employees and owners and their identification information, including names, dates of birth, social security numbers, addresses, and telephone numbers;

(4) 1998 through 2006 individual and business tax returns; correspondence to and/or from the Internal Revenue Service pertaining to income tax returns; work papers, correspondence, notes, and/or other documents related to the preparation of tax returns;

(5) Immigration and identification documents, more particularly described as passports, alien registration cards, visas, applications and petitions for visa, drivers licenses, consular identification cards, social security documents, credit cards, and any other cards, records, or documents pertaining to the identification and status of the employees and/or owner(s);

(6) Business records and agreements, promissory notes, expense account ledgers, transportation receipts, and any documents demonstrating an employment, business and/or financial relationship between Pepe's employees and the owner(s);

(7) Real estate records related to the purchase, sale, or transfer of the property, business and/or real assets of Pepe's. Such records should include title company records, loan records, documents filed with county records (i.e., Grant Deeds, Quit Claim Deeds, Deeds of Trust, etc.), and documents related to payments received or made for the property/business and/or real assets via wire or mail, cashier's checks. money orders, etc. Any other documents related to the ownership or leasing of the business and/or property;

(8) Utility bills, such as electric bills (PG & E), water bills, telephone bills; bank statements and credit card bills for the business and/or owners; payments, invoices, receipts, leasing and/or mortgage agreements and payments, and other documents related to the ownership and/or control of the business and/or property;

(9) Safes, storage lockers, safety deposit boxes, keys, combinations, receipts, and/or records for those items believed to be associated with the employment and/or harboring of illegal aliens. Based on my training and experience and that of other ICE agents, it is very common for individuals to maintain safes in their businesses to safeguard valuables and important documents, such as immigration documents, tax documents, and property, business and financial records.

B. Computers and Digital Storage Media

(10) Individuals, who are involved in the employment of illegal aliens, retain evidence of such activities on their computers or other forms of electronic storage media. Such evidence can be in the form of images stored individually or embedded in other documents in order to conceal the activities. Even where all evidence of such activity has been deleted, lost evidence can still be recovered from computers or other forms of electronic storage media.

8

(11) Computers and related electronic devices are common instruments utilized by individuals in many businesses and are often used as an alternative for hard copy document storage and handwritten correspondence. These computers are also used for writing correspondence, communicating with other computer users through the use of electronic messages (such as e-mail and websites), managing their assets, documenting and tracking financial transactions pertaining to their personal and business income and expenses, generating financial reports for the purpose of preparing their income tax returns, and monitoring their business or other legal/illegal activities.

(12) This affiant has consulted with ICE Special Agent Kendrick Yeung, a Computer Forensics Agent. Special Agent Yeung has received extensive training as a Computer Forensics Agent and in the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation and authentication of evidence.

(13) Based upon my training, experience, and information relayed to me by other Special Agents and others involved in the forensic examination of computers, specifically Special Agent Yeung, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips. I further know that searches and seizures of evidence from computers commonly require agents to seize most or all computer items (hardware, software, and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment for the following reasons:

(a) Volume of Evidence. Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, Bernoulli drives, and zip drives) can store so many pages of information that it would be impractical to attempt this kind of data search on the site. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data.

(b) Technical Requirements. Searching computer systems is a highly technical process requiring specific expertise and specialized equipment. The vast array of computer hardware and software available makes it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment to conduct a thorough search. It may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

(c) Files May be Hidden, Erased, Compressed, Password-Protected, Or Encrypted. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased,

9

compressed, encrypted, or password-protected data. When the user wants to conceal criminal evidence, he or she could store it in many places, in random order, and with deceptive file names and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, through a process called "steganography," a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. These processes require a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

(d) Danger of Destruction of Evidence. Because computer evidence is extremely vulnerable to tampering or destruction (either from external sources or from a destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

(1) In order to fully retrieve data from a computer system, the analyst needs to seize all or most of a computer's equipment including hardware, a system's peripheral devices, software, documentation, and passwords and data security devices so that a qualified computer expert can accurately retrieve the data in a laboratory or other controlled environment. This is true because the peripheral devices that allow a user to enter or retrieve data from storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular peripheral (or input/output) devices to read data on the system.

(2) Certain operating systems can be configured to operate only with a precise set of hardware, software, or peripherals. In these instances, it is important for the analyst to properly reconfigure the system as it normally operates in order to accurately retrieve evidence.

(3) In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) any application software that may have been used to create the data (whether stored on hard drives or external media), and other documentation and data security devices.

25. In executing the search warrants, the government will follow the Northern District of California's "Protocol for Searching Devices or Media that Store Data Electronically" as set forth in Attachment C, and incorporated herein by reference.

26. Definitions Applying to Search and Seizure of Computers

For purposes of the warrants, the foregoing terms are defined as follows:

(a) Computer: The term "computer" is defined under 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

(b)  Hardware.  Computer hardware consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes (but is not limited to) any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants, and WebTV units), internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations.  The term "computer" is defined under 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

(c) System Peripherals.  A piece of equipment that sends data to, or receives data from, a computer.  Keyboards, mouses, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

(d) Software.  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

(e) Documentation. Computer-related documentation consists of written recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

(f)  Passwords and Data Security Devices.  Computer passwords and other data security devices are designed to restrict access to or hide computer software,

11

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, cards, and circuit boards. Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

(g)     Storage Media. Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVD's, magnetic tapes, ZIP disks, JAZZ disks, and EPROMS.

VI.     BACKGROUND REGARDING THE INTERNET AND E-MAIL

27. Based on my knowledge, training, and experience, and the experience of other law enforcement officers, I have knowledge of the Internet and how it operates. I know that the Internet is a worldwide computer network which connects computers and allows communications and transfer of information and data across state and national boundaries. Individuals who utilize the Internet can communicate by using electronic mail. To access the Internet, the individual computer user must subscribe to an Internet Service Provider ("ISP"), which operates a host computer system with direct access to the Internet.

28. With a computer connected to the Internet through an ISP, the individual computer user can make electronic contact with computers around the world. This connection can be made by any number of means, including modem, local area network, and wireless methods.

29. The following paragraphs describe some of the functions and features of the Internet as it relates to the subject of this search warrant.

a.     Internet Service Providers ("ISPs"): Individuals who have an Internet account and an Internet based E-mail address must have a subscription, membership, or affiliation with an organization or commercial service which provides access to the Internet. A provider of Internet access and services is referred to as an Internet Service Provider or "ISP."

b.     Electronic Mail ("E-Mail"): E-mail is an electronic form of communication which usually contains written correspondence. It is similar to conventional paper mail in that it is addressed from one individual to another. An E-mail usually contains a message "header" which generally displays the sender's E-mail address, the recipient's E-mail address, and the date and time of the E-mail transmission. If a sender chooses to do so, he or she can type a subject line into the header. E-mail

message "headers" usually contain information, such as identification of the sender's ISP, which enables law enforcement officers to trace the message back to the original sender.

c. <u>Internet Addresses</u>: Every device on the Internet has an address that allows other devices to locate and communicate with it. An Internet Protocol (IP) address is a unique number that identifies a device on the Internet. Other addresses include Uniform Resource Locator (URL) addresses, such as "http://www.usdoj.gov," which are typically used to access web sites or other services on remote devices. Domain names of Web sites, host names, and machine addresses are other types of addresses associated with Internet use. Domain names registrars contain registration information concerning the identity of the owner of a domain name.

30. <u>Yahoo, Inc. ("Yahoo")</u>: Based on my training and experience, I have learned the following about Yahoo:

a. Yahoo is an Internet Service Provider that provides, among other services, e-mail accounts and Internet access to its subscribers;

b. Yahoo has an E-mail service which is available free of charge to Internet users. Subscribers obtain an account by registering on the Internet with Yahoo. Yahoo requests subscribers to provide basic information, such as name, gender, zip code and other personal/biographical information. However, Yahoo does not verify the information provided;

c. A Yahoo subscriber can store files, including E-mails and image files, on servers maintained and/or owned by Yahoo;

d. Yahoo maintains electronic records pertaining to the individuals and companies for which it maintains subscriber accounts. These records include account access information, e-mail transaction information, account application information, and other information in computer data format, which records the activities and interactions of these accounts;

e. Subscribers to Yahoo may access their accounts on servers maintained and/or owned by Yahoo from any computer connected to the Internet located anywhere in the world;

f. Any e-mail that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo servers until the subscriber connects to Yahoo and retrieves his/her messages. After the subscriber retrieves a particular message, that message can remain on the Yahoo system indefinitely, unless the subscriber specifically deletes the message from the system;

g. When the subscriber sends e-mail, it is initiated at the user's computer, transferred to Yahoo servers and then transmitted to its end destination; and

h. A Yahoo subscriber can store e-mails and attached files in his or her own "mail box" or on servers maintained and/or owned by Yahoo.

## VII.  CONCLUSION

31.  Based upon the foregoing facts, my experience and training, and consultation with other experienced ICE agents, there is probable cause to believe that the items to be seized, described in Attachment B, will be found at Pepe's Cabinets, located at 1285 47th Avenue #A, Oakland, California, described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 8 U.S.C. § 1324(a)(1)(A)(iii) [Harboring of Illegal Aliens] and 8 U.S.C. § 1324a (a)(1)(A) and § 1324a (a)(2) [Employment of Illegal Aliens].

32.  Because this investigation is continuing, disclosure of the search warrant, affidavit, application and the attachments thereto will jeopardize the ongoing investigation. Accordingly, I respectfully request that the search warrant, affidavit, application and all attachments be sealed until further order of this Court.

I declare under penalty of perjury that the above statements are true and accurate to the best of my knowledge and belief.

MICHAEL BARGE
Special Agent
U.S. Immigration and Customs Enforcement

Subscribed and sworn before me on this 29th day of October 2007 at San Francisco, CA.

HONORABLE EDWARD M. CHEN
United States Magistrate Judge

14

ATTACHMENT A: DESCRIPTION OF PREMISES TO BE SEARCHED

Pepe's Cabinets is located at 1285 47th Avenue #A, Oakland, California, in a single-story shared warehouse structure adorned with a large sign which reads "Pepe's Cabinets" in red letters on a white background. Pepe's Cabinets is situated approximately 200 feet west of the intersection at 47th Avenue and International Blvd on the north side of 47th Avenue. The building is directly attached to neighboring businesses on both sides.

ATTACHMENT B: ITEMS TO BE SEIZED

A. Records and Tangible Items

(1) Employee and personnel records and documents, more particularly described as employment applications, time cards, payroll records, payroll stubs, payroll checks, withholding records and statements, correspondence with payroll processing companies, workers compensation records and claims, identification checks, I-9 forms, work permits, job applications, federal and state required filings, employment agency referral slips, employment agency documents, personnel rosters, work schedules, dates of employment, and any other employee-related records, including financial agreements, promissory or other notes, and correspondence between employees and employers. Employee records, as described above, may be in any form, including computerized, electronic, or hard paper copies;

(2) Documents, correspondence and other items between Pepe's and/or its owner(s) and the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Social Security Administration, Internal Revenue Service, and/or other federal, state or local agency, including the California Employment Development Department and the City of Oakland Business Tax Office, and all other documents, records, correspondence, and notes related to employment, immigration status, and financial and/or business activities;

(3) Documents, records, correspondence, and notes related to Pepe's employees and owners and their identification information, including names, dates of birth, social security numbers, addresses, and telephone numbers;

(4) 1998 through 2006 individual and business tax returns; correspondence to and/or from the Internal Revenue Service pertaining to income tax returns; work papers, correspondence, notes, and/or other documents related to the preparation of tax returns;

(5) Immigration and identification documents, more particularly described as passports, alien registration cards, visas, applications and petitions for visa, drivers licenses, consular identification cards, social security documents, credit cards, and any other cards, records, or documents pertaining to the identification and status of the employees and/or owner(s);

(6) Business records and agreements, promissory notes, expense account ledgers, transportation receipts, and any documents demonstrating an employment, business and/or financial relationship between Pepe's employees and the owner(s);

(7) Real estate records related to the purchase, sale, or transfer of the property, business and/or real assets of Pepe's. Such records should include title company records, loan records, documents filed with county records (i.e., Grant Deeds, Quit Claim Deeds, Deeds of Trust, etc.), and documents related to payments received or made for the property/business and/or real assets via wire or mail, cashier's checks, money orders, etc.

Any other documents related to the ownership or leasing of the business and/or property;

(8)    Utility bills, such as electric bills (PG & E), water bills, telephone bills; bank statements and credit card bills for the business and/or owners; payments, invoices, receipts, leasing and/or mortgage agreements and payments, and other documents related to the ownership and/or control of the business and/or property;

(9)    Safes, storage lockers, safety deposit boxes, keys, combinations, receipts, and/or records for those items believed to be associated with the employment and/or harboring of illegal aliens. Based on my training and experience and that of other ICE agents, it is very common for individuals to maintain safes in their businesses to safeguard valuables and important documents, such as immigration documents, tax documents, and property, business and financial records.

B.    Computers and Digital Storage Media

(10)    Any and all computers, hardware, software, system peripherals, documentation, passwords and data security devices, and storage media. These devices include computers, computer components, computer peripherals, word processing equipment, modems, monitors, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices as defined below:

(a) Computer: The term "computer" is defined under 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

(b) Hardware. Computer hardware consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants, and WebTV units), internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations. The term "computer" is defined under 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

(c) <u>System Peripherals</u>. A piece of equipment that sends data to, or receives data from, a computer. Keyboards, mouses, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

(d) <u>Software</u>. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

(e) <u>Documentation</u>. Computer-related documentation consists of written recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

(f) <u>Passwords and Data Security Devices</u>. Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, cards, and circuit boards. Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

(g) <u>Storage Media</u>. Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVD's, magnetic tapes, ZIP disks, JAZZ disks, and EPROMS.

(11) Electronically stored communications;

(12) Computer passwords that may control access to a computer operating system or individual computer files, and other data security devices designed to restrict access to or hide computer software, documentation or data;

(13) Physical keys, encryption devices and similar physical items that are necessary to gain access to computer programs, data or other information or otherwise to render programs, data or other information into a readable or usable form;

(14) All instruction or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The

items to be seized include operating systems, application software, passwords, decryption keys, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission; and

(15)    All written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related devices which are present at the scene.

**ATTACHMENT C**

## United States District Court for the Northern District of California

### *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

1.    In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2.    If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3.    The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for off site examination – unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime, or fruit of crime.  The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device in which data is stored electronically.

4.    If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5.    The government will complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar days after the initial execution of the warrant.  Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime.  Within a reasonable period, not to exceed

i

sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime. The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6.    In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7.    The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8.    The government will promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

1
2
3
4
5
6
7
8

**EXHIBIT B**

9

Declaration by ICE Special Agent Michael Barge

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT                )
                                             )
NORTHERN DISTRICT OF CALIFORNIA )

Re:    U.S. v. Jose De Jesus Guzman-Baez
       CR 07-0794 DLJ; CR 07-0797 DLJ

## DECLARATION

I, MICHAEL BARGE, declare as follows:

1.      I am a Special Agent with United States Immigration and Customs Enforcement
("ICE"), Department of Homeland Security, and have been so employed for over three
years. As the case agent, I am thoroughly familiar with the facts in the above-captioned
matters. I submit this declaration for the sole purpose of refuting untrue statements made
in defendant's unsigned declaration in support of his motion.

2. I have reviewed defendant's motion to suppress evidence based upon the search
warrant executed on November 6, 2007. In his motion, defendant argues that the affidavit
in support of the search warrant does not support that he had knowledge that Maria
Guadalupe Gamino-Perez, his employee at Pepe's Cabinets, is an illegal alien. In his
declaration, defendant states that, on or about July 27, 2007, the Coast Guard Security
Police stopped a vehicle that he was driving.  According to defendant, he and his
passenger Ms. Gamino-Perez were separated for  most of the time they were detained.
Defendant claims that they were first detained in separate cars, and then later, Ms.
Gamino-Perez was pulled away from him by an officer who wanted to speak to her.
Defendant states that Ms. Gamino-Perez speaks English, but claimed that he neither
speaks nor understands English. Defendant stated that the officers attempted to speak to
him, but he communicated that he could not understand them. Defendant further states
that no officer spoke fluent Spanish, although one officer spoke some broken Spanish and
communicated with him in broken Spanish. Defendant claims that he did not see or hear
anything during this incident about Ms. Gamino-Perez's work status in the United States.

3.      I know that defendant's statements in his declaration are untrue based upon my
interview with defendant on November 6, 2007 and my follow-up interview with Coast
Guard Security Police Officer Bill Bermudez on March 27, 2008.

    A. ICE Interview with Defendant

    (1) On November 6, 2007, ICE Special Agent Dwayne Cook and I interviewed
and obtained a sworn statement from defendant, who was read his Miranda rights and
agreed to speak with agents without counsel present. The entire interview, including the
reading of Miranda rights, was conducted in the Spanish language. Special Agent Cook,
who was born in Mexico and is fluent in the Spanish language, was the interpreter.

(2)     During the interview, defendant admitted that he "suspects" that all of his employees at Pepe's Cabinets are illegal aliens. Defendant specifically named five of his employees, including Maria Guadalupe Gamino-Perez, whom he knew for certain are illegal aliens based on conversations he has had or has overhead.

(3) Defendant discussed being stopped with his secretary Maria Guadalupe Gamino-Perez at the Coast Guard Island military base in Alameda, California. Defendant stated that they were attempting to enter Coast Guard Island to provide a work estimate. Defendant stated that he learned that Ms. Gamino-Perez is an illegal alien when she provided the officers with her Matricula (Mexico Consular ID) card and admitted to the officers that she does not have legal documents to be in the United States.

(4) The full interview with defendant is documented in the four-page "Record of Sworn Statement," which is attached to this declaration. Defendant signed the first and last pages and initialed every page of the "Record of Sworn Statement"after Special Agent Cook translated and read each page to defendant in the Spanish language and verified with defendant that the contents of each page are accurate. The first and last pages also contain defendant's right thumb print and right index print. The first page of the "Record of Sworn Statement" states that the interview was conducted in the Spanish language and that "D. Cook" was the interpreter. On the first page, when asked "Do you swear that all of the statements you are about to make will be the truth, the whole truth, and nothing but the truth, so help you God?", defendant responded "yes." On the last page, defendant signed the following statement: "I have read the foregoing (or it has been translated and read to me in the Spanish language) and solemnly swear it is the true and correct record of the statement made by me on this day and that all the statements are true and correct."

### B. ICE Interview with Coast Guard Police Officer

On March 27, 2008, I conducted a follow-up interview with Coast Guard Security Police Officer Bill Bermudez at Coast Guard Island in Alameda, California. Officer Bermudez told me the following:

(1) On July 27, 2007, Officer Bermudez encountered defendant and a female front passenger [hereafter referred to as Maria Guadalupe Gamino-Perez] at the main security gate to Coast Guard Island. Defendant was driving a vehicle with expired registration tags and a suspended California driver's license.

(2) For security reasons, every person attempting to enter the military base at Coast Guard Island is required to provide a government-issued photo identification.     In defendant's presence, Officer Bermudez asked the female passenger for her identification. When Ms. Gamino-Perez gave him a puzzled look, Officer Bermudez asked defendant if Ms. Gamino-Perez had identification. Defendant said something to Ms. Gamino-Perez in Spanish and Ms. Gamino-Perez then handed Officer Bermudez her Mexican Matricula card.

2

(3) Officer Bermudez asked defendant if Ms. Gamino-Perez had any other identification. Defendant again spoke to Ms. Gamino-Perez in Spanish and he then responded "no." Officer Bermudez asked defendant "then you know she's an illegal alien." Defendant acknowledged yes by shaking his head up and down.

5.     Based upon my conversations with defendant in English during the course of the investigation about certain matters, including his business and how he dealt with customers, I believe that defendant can understand and communicate in basic English. For example, as set forth in the search warrant affidavit, on November 15, 2006, I and another ICE agent entered Pepe's Cabinets in an undercover capacity as potential customers. I received a Pepe's business card bearing the name Jose Guzman. When I asked the owner, "who is Jose Guzman?," Guzman responded, "That's me," and then explained that his nickname is "Pepe"(Search Warrant Affidavit ¶ 10).

6.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

$3/26/08$
Dated

MICHAEL BARGE
Special Agent
U.S. Immigration and Customs Enforcement

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**

Indictment

CR007-00797 DLJ; CR07-00794 DLJ

1   SCOTT N. SCHOOLS (SCBN 9990)
    United States Attorney

2

3                                                        **FILED**

4                                                        DEC 1 3 2007

5                                                    RICHARD W. WIEKING
                                                   CLERK, U.S. DISTRICT CT.
                                                  NORTHERN DISTRICT OF CALIFORNIA
6       E-filing                                           OAKLAND

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11
                                             CR07-0794    DLJ
12   UNITED STATES OF AMERICA,        )      Criminal No.:
                                      )
13              Plaintiff,            )
                                      )      VIOLATIONS: 8 U.S.C. § 1324(a)(1)(A)(iii)
14              v.                    )      [Harboring of Illegal Alien]; 18 U.S.C.
                                      )      § 1546(a) [Possession of Counterfeit
15   JOSE DE JESUS GUZMAN-BAEZ        )      Immigration Document]; 42 U.S.C.
     [a/k/a Jose De Jesus Guzman, a/k/a Jose )  § 408(a)(7)(B) [Fraudulent Use of Social
16   Guzman, a/k/a Pepe],            )      Security Number]
                                      )
17              Defendant.            )      OAKLAND VENUE
                                      )
18   _____)

19                          I N D I C T M E N T

20   The Grand Jury charges:

21   COUNT ONE: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

22          Beginning at a time unknown, but not later than in or about August 2007, and continuing

23   until on or about November 6, 2007, in the Northern District of California, the defendant,

24                       JOSE DE JESUS GUZMAN-BAEZ,

25   knowing and in reckless disregard of the fact that an alien, Michel V-P., had come to, entered, and

26   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

27   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

28   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

     INDICTMENT

1    COUNT TWO: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

2        Beginning at a time unknown, but not later than in or about June 2007, and continuing until

3    on or about November 6, 2007, in the Northern District of California, the defendant,

4                        JOSE  DE JESUS GUZMAN-BAEZ,

5    knowing and in reckless disregard of the fact that an alien, Leopoldo P. C., had come to, entered, and

6    remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

7    and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

8    detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

9    COUNT THREE: (8 U.S.C. § 1324(a)(1)(A)(iii)- Harboring of Illegal Alien)

10       Beginning at a time unknown, but not later than in or about October 2006, and continuing

11   until on or about November 6, 2007, in the Northern District of California, the defendant,

12                       JOSE  DE JESUS GUZMAN-BAEZ,

13   knowing and in reckless disregard of the fact that an alien, Maria G-P., had come to, entered, and

14   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

15   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

16   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

17   COUNT FOUR: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

18       Beginning at a time unknown, but not later than in or about January 2007, and continuing

19   until on or about November 6, 2007, in the Northern District of California, the defendant,

20                       JOSE  DE JESUS GUZMAN-BAEZ,

21   knowing and in reckless disregard of the fact that an alien, Marvin T-G., had come to, entered, and

22   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

23   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

24   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

25

26

27

28

INDICTMENT                          2

1   COUNT FIVE: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

2         Beginning at a time unknown, but not later than in or about May 2007, and continuing until

3   on or about November 6, 2007, in the Northern District of California, the defendant,

4                      JOSE DE JESUS GUZMAN-BAEZ,

5   knowing and in reckless disregard of the fact that an alien, Jamie S-S., had come to, entered, and

6   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

7   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

8   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

9   COUNT SIX: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

10        Beginning at a time unknown, but not later than in or about August 2006, and continuing

11   until on or about November 6, 2007, in the Northern District of California, the defendant,

12                    JOSE DE JESUS GUZMAN-BAEZ,

13   knowing and in reckless disregard of the fact that an alien, Marcelino L., had come to, entered, and

14   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

15   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

16   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

17   COUNT SEVEN: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

18        Beginning at a time unknown, but not later than in or about June 2007, and continuing until

19   on or about November 6, 2007, in the Northern District of California, the defendant,

20                    JOSE DE JESUS GUZMAN-BAEZ,

21   knowing and in reckless disregard of the fact that an alien, Maria R., had come to, entered, and

22   remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

23   and shield the alien from detection, and attempted to conceal, harbor, and shield the alien from

24   detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

25

26

27

28

INDICTMENT                 3

1  COUNT EIGHT: (8 U.S.C. § 1324(a)(1)(A)(iii) - Harboring of Illegal Alien)

2      Beginning in or about April 2006, and continuing until on or about November 6, 2007, in the

3  Northern District of California, the defendant,

4                          JOSE DE JESUS GUZMAN-BAEZ,

5  knowing and in reckless disregard of the fact that an alien, Jesus V-I., had come to, entered, and

6  remained in the United States in violation of law, did knowingly and intentionally conceal, harbor,

7  and shield the alien from detection, and attempt to conceal, harbor, and shield the alien from

8  detection, in any place, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii).

9  COUNT NINE: (18 U.S.C. § 1546(a) - Possession of Counterfeit Immigration Document)

10     On or about November 6, 2007, in the Northern District of California, the defendant,

11                         JOSE DE JESUS GUZMAN-BAEZ,

12 did knowingly possess a forged, counterfeited, altered, and falsely made alien registration receipt

13 card, a document prescribed by statute or regulation as evidence of authorized stay and employment

14 in the United States, knowing it to be forged, counterfeited, altered, and falsely made and to have

15 been otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States

16 Code, Section 1546(a).

17 COUNTS TEN AND ELEVEN: 42 U.S.C. § 408(a)(7)(B) [Fraudulent Use of Social Security
                                    Number]
18
       On or about the dates set forth below, in the Northern District of California, the defendant,
19
                           JOSE DE JESUS GUZMAN-BAEZ,
20
   purposefully and with intent to deceive, did knowingly use Social Security Number 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 in
21
   connection with his filings of Business Tax Declarations with the City of Oakland Business Tax
22
   Office on behalf of his business "Pepe's Cabinets," falsely representing that the number was assigned
23

24

25

26

27

28

INDICTMENT                         4

1  to him by the Commissioner of Social Security, when in fact such number was not the number

2  assigned to the defendant, in violation of Title 42, United States Code, Section 408(a)(7)(B).

3          <u>Count</u>        <u>Renewal Tax Year</u>              <u>Date Filed</u>

4          10            2003                          3/5/04

5          11            2005                          2/2/05

6

7  DATED: December 13, 2007                 A TRUE BILL.

8

9                                           FOREPERSON

10

11  SCOTT N. SCHOOLS
    United States Attorney
12

13  W. DOUGLAS SPRAGUE
    Chief, Oakland Branch
14

15

16  (Approved as to form: _____)
                         AUSA Deborah R. Douglas
17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                                 5